# INTERMOUNTAIN RATE CASES.[1]

## APPEALS FROM THE UNITED STATES COMMERCE COURT.

Nos. 136, 162.　Argued October 18, 21, 22, 1912.—Decided June 22, 1914.

Prior to the amendment of June 18, 1910, § 4 of the Act to Regulate Commerce lodged in the carrier the right to exercise a primary judgment, subject to administrative control and ultimate judicial review, concerning the necessity and propriety of making a lower rate for the longer than the shorter haul, thus giving the carrier power to exert its judgment as to things of a public nature; but the amendment withdrew that right of primary judgment and lodged it in the Interstate Commerce Commission to be exercised on request and after due investigation and consideration of the public interests concerned and in view of the preference and discrimination clauses of §§ 2 and 3 of the act.

The long and short-haul provisions of § 4 of the Act to Regulate Commerce as amended by the act of June 18, 1910, are not repugnant to the Constitution of the United States as a delegation of power to the Interstate Commerce Commission beyond the competency of Congress.

If a statute is constitutional, this court must be governed by it and its plain meaning; with the wisdom of Congress in adopting the statute this court has nothing to do.

In *Louis. & Nash. R. R. Co.* v. *Kentucky*, 183 U. S. 503, this court decided that a general enforcement of the long and short-haul clause of the Act to Regulate Commerce would not be repugnant to the Constitution, and will not now reconsider and overrule that decision.

The Commerce Court had jurisdiction of a suit to enjoin the enforcement of the order of the Interstate Commerce Commission involved in these cases and which refused the request of carriers to put in force rates requested by them.

Under § 4 of the Act to Regulate Commerce, as amended by the act of June 18, 1910, the Interstate Commerce Commission has power to make an order, such as that involved in these cases, permitting a

---

[1] Docket title of these cases: No. 136, United States of America, Interstate Commerce Commission et al., v. Atchison, Topeka & Santa Fe Railway Company et al.　No. 162, United States of America, Interstate Commerce Commission et al., v. Atchison, Topeka & Santa Fe Railway Company et al.

lower rate for the longer haul but only on terms stated in the order, establishing zones for the intermediate points and relative percentages upon which proportionate rates should be based.

191 Fed. Rep. 856, reversed.

THE facts, which involve the constitutionality of the long and short-haul provisions of the Act to Regulate Commerce as amended by the act of June 18, 1910, and the validity of an order made in pursuance thereof by the Interstate Commerce Commission, are stated in the opinion.

*Mr. Attorney General Wickersham* and *Mr. Assistant to the Attorney General Fowler,* with whom *Mr. Blackburn Esterline,* Special Assistant to the Attorney General, was on the brief, for the United States.

*Mr. P. J. Farrell* for the Interstate Commerce Commission.

*Mr. Charles Donnelly, Mr. F. W. M. Cutcheon* and *Mr. F. C. Dillard* for appellees.

*Mr. Rush C. Butler, Mr. William E. Lamb, Mr. Stephen A. Foster* and *Mr. Cornelius Lynde* filed a reply brief on behalf of the Chicago Association of Commerce.

*Mr. Joseph N. Teal* for Portland Chamber of Commerce.

*Mr. J. B. Campbell* for the City of Spokane.

*Mr. William A. Glasgow, Jr.,* for Giroux Consolidated Mines Co.

By leave of court, *Mr. Alfred P. Thom* filed a brief in behalf of certain interested parties.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

We shall seek to confine our statement to matters which are essential to the decision of the case. The provisions of § 4 of the Act to Regulate Commerce dealing with what is known as the long and short-haul clause, the power of

carriers because of dissimilarity of circumstances and conditions to deviate from the exactions of such clause and the authority of the Interstate Commerce Commission in relation to such subjects were materially amended by the act of June 18, 1910, c. 309, 36 Stat. 539, 547. Following the form prescribed by the Commission after the amendment in question, the seventeen carriers who are appellees on this record made to the Interstate Commerce Commission their "application for relief from provisions of fourth section of Amended Commerce Act in connection with the following tariffs." The tariffs annexed to the applications covered the whole territory from the Atlantic seaboard to the Pacific coast and the Gulf of Mexico, including all interior points and embracing practically the entire country, and the petition asked the Interstate Commerce Commission for authority to continue all rates shown on the tariffs from the Atlantic seaboard to the Pacific coast and from the Pacific coast to the Atlantic seaboard and to and from interior points lower than rates concurrently in effect from and to intermediate points. It was stated in the petition: "This application is based upon the desire of the interested carriers to continue the present method of making rates lower at the more distant points than at the intermediate points; such lower rates being necessary by reason of competition of various water carriers and of carriers partly by water and partly by rail operating from Pacific coast ports to Atlantic seaboard ports; competition of various water carriers operating to foreign countries from Pacific coast ports and competition of the products of foreign countries with the products of the Pacific coast; competition of the products of Pacific coast territory with the products of other sections of the country; competition of Canadian rail carriers not subject to the Interstate Commerce Act; competition of the products of Canada moving by Canadian carriers with the products of the United States; rates established via

the shorter or more direct routes, but applied also via the longer or more circuitous routes." After full hearing the Commission refused to grant unqualifiedly the prayer of the petition but entered an order permitting in some respects a charge of a lower rate for the longer haul to the Pacific coast than was asked for intermediate points provided a proportionate relation was maintained between the lower rate for the longer haul to the Pacific coast and the higher rate to the intermediate points the proportion to be upon the basis of percentages which were fixed. For the purposes of the order in question the Commission in substance adopted a division of the entire territory into separate zones which division had been resorted to by the carriers for the purposes of the establishment of the rates in relation to which the petition was filed. Refusing to comply with this order the carriers commenced proceedings in the Commerce Court praying a decree enjoining the enforcement of the fourth section as amended on the ground of its repugnancy to the Constitution of the United States and of the order as being in any event violative of the amended section as properly construed. An interlocutory injunction was ordered. The defendants moved to dismiss and on the overruling of the motions appealed from the interlocutory order, the case being No. 136. Subsequently upon the election of the defendants to plead no further a final decree was entered and appealed from, that appeal being No. 162.

It suffices at this moment to say that all the contentions which the assignments of error involve and every argument advanced to refute such contentions, including every argument urged to uphold on the one hand or to overthrow on the other the action of the Commission, as well as every reason relied upon to challenge the action of the court or to sustain its judgment, are all reducible to the following propositions:

(a) The absolute want of power of the court below to

deal with the subject involved in the complaint because controversies concerning the fourth section of the Act to Regulate Commerce of the nature here presented were by an express statutory provision excluded from the cognizance of the court below. (b) That even if this be not the case the action of the Commission which was complained of was purely negative and therefore not within the cognizance of the court because not inherently justiciable. (c) That correctly interpreting the fourth section the order made by the Commission was absolutely void because wholly beyond the scope of any power conferred by the fourth section as amended. (d) That even if in some respects the order of the Commission was within the reach of its statutory power there was intermingled in the order such an exertion of authority not delegated as to cause the whole order to be void. (e) That the order of the Commission was void even if the fourth section be interpreted as conferring the authority which the Commission exerted, since under that assumption the fourth section as amended was repugnant to the Constitution.

All the propositions, even including the jurisdictional ones, are concerned with and depend upon the construction of the fourth section as amended, and we proceed to consider and pass upon that subject and every other question in the case under four separate headings: 1, The meaning of the statute; 2, Its constitutionality; 3, The jurisdiction of the court; 4, The validity of the order in the light of the statute as interpreted.

1. *The meaning of the statute.*

We reproduce the section as originally adopted and as amended, passing a line through the words omitted by the amendment and printing in italics those which were added by the amendment, thus at a glance enabling the section to be read as it was before and as it now stands after amendment.

"SEC. 4. That it shall be unlawful for any common car-

rier subject to the provisions of this Act to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, ~~under substantially similar circumstances and conditions,~~ for a shorter than for a longer distance over the same line *or route* in the same direction, the shorter being included within the longer distance, *or to charge any greater compensation as a through route than the aggregate of the intermediate rates subject to the provisions of this Act;* but this shall not be construed as authorizing any common carrier within the terms of this Act to charge ~~and~~ *or* receive as great compensation for a shorter as for a longer distance: Provided, however, That upon application to the *Interstate Commerce* Commission ~~appointed under the provisions of this Act~~, such common carrier may in special cases, after investigation ~~by the Commission~~, be authorized *by the Commission* to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section ~~of this Act:~~ *Provided, further, That no rates or charges lawfully existing at the time of the passage of this amendatory Act shall be required to be changed by reason of the provisions of this section prior to the expiration of six months after the passage of this Act, nor in any case where application shall have been filed before the Commission, in accordance with the provisions of this section, until a determination of such application by the Commission.*

"*Whenever a carrier by railroad shall in competition with a water route or routes reduce the rates on the carriage of any species of freight to or from competitive points, it shall not be permitted to increase such rates unless after hearing by the Interstate Commerce Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition.*"

Before considering the amended text we state briefly some of the more important requirements of the section before amendment and the underlying conceptions of private right, of public duty and policy which it embodied, because to do so will go a long way to remove any doubt as to the amended text and will moreover serve to demon-, strate the intent of the legislative mind in enacting the amendment.

Almost immediately after the adoption of the Act to Regulate Commerce in 1887 (February 4, 1887, c. 104, 24 Stat. 379), the Interstate Commerce Commission in considering the meaning of the law and the scope of the duties imposed on the Commission in enforcing it, reached the conclusion that the words "under substantially similar circumstances and conditions" of the fourth section dominated the long and short-haul clause and empowered carriers to primarily determine the existence of the required dissimilarity of circumstances and conditions and consequently to exact in the event of such difference a lesser charge for the longer than was exacted for the shorter haul and that competition which materially affected the rate of carriage to a particular point was a dissimilar circumstance and condition within the meaning of the act. We say primarily because of course it was further recognized that the authority existing in carriers to the end just stated was subject to the supervision and control of the Interstate Commerce Commission in the exertion of the powers conferred upon it by the statute and especially in view of the authority stated in the fourth section. In considering the act comprehensively it was pointed out that the generic provisions against preference and discrimination expressed in the second and third sections of the act were all-embracing and were therefore operative upon the fourth section as well as upon all other provisions of the act. But it was pointed out that where within the purview of the fourth section it had lawfully resulted that

the lesser rate was charged for a longer than was exacted
for a shorter haul such exaction being authorized could
not be a preference or discrimination and therefore illegal.
*In re Louisville & Nashville R. R. Co.*, 1 I. C. C. 31.
These comprehensive views announced at the inception
as a matter of administrative construction were subse-
quently sustained by many decisions of this court, and to
the leading of such cases we refer in the margin.[1]  We ob-
serve, moreover, that in addition it came to be settled
that where competitive conditions authorized carriers to
lower their rates to a particular place the right to meet
the competition by lowering rates to such place was not
confined to shipments made from the point of origin of
the competition, but empowered all carriers in the interest
of freedom of commerce and to afford enlarged opportu-
nity to shippers to accept, if they chose to do so, shipments
to such competitive points at lower rates than their gen-
eral tariff rates: a right which came aptly to be described
as "market competition" because the practice served to
enlarge markets and develop the freedom of traffic and
intercourse.  It is to be observed, however, that the right
thus conceded was not absolute because its exercise was
only permitted provided the rates were not so lowered as
to be non-remunerative and thereby cast an unnecessary
burden upon other shippers.  *East Tenn. &c. R. Co.* v.
*Interstate Com. Comm.*, 181 U. S. 1.  As the statute as thus
construed imposed no obligation to carry to the competi-
tive point at a rate which was less than a reasonable one,
it is obvious that the statute regarded the rights of private
ownership and sought to impose no duty conflicting there-
with.  It is also equally clear that in permitting the carrier

---

[1] *Int. Com. Comm.* v. *Balt. & Ohio Railroad*, 145 U. S. 263; *Cinn.,
N. O. & Tex. Pac. Ry.* v. *Int. Com. Comm.*, 162 U. S. 184; *Texas & Pac.
Railway* v. *Int. Com. Comm.*, 162 U. S. 197; *Louisville & N. R. Co.* v.
*Behlmer*, 175 U. S. 648; *East Tenn. &c. R. Co.* v. *Int. Com. Comm.*, 181
U. S. 1.

to judge primarily of the competitive conditions and to meet them at election the statute lodged in the carrier the right to exercise a primary judgment concerning a matter of public concern broader than the mere question of the duty of a carrier to carry for a reasonable rate on the one hand and of the right of the shipper on the other to compel carriage at such rate, since the power of primary judgment which the statute conferred concerned in a broad sense the general public interest with reference to both persons and places, considerations all of which therefore in their ultimate aspects came within the competency of legislative regulation. It was apparent that the power thus conferred was primary, not absolute, since its exertion by the carrier was made by the statute the subject both of administrative control and ultimate judicial review. And the establishment of such control in and of itself serves to make manifest the public nature of the attributes conferred upon the carrier by the original fourth section. Indeed that in so far as the statute empowered the carrier to judge as to the dissimilarity of circumstances and conditions for the purpose of relief from the long and short-haul clause it but gave the carrier the power to exert a judgment as to things public was long since pointed out by this court. *Texas & Pac. Railway* v. *Interstate Com. Comm.*, 162 U. S. 197, 218.

With the light afforded by the statements just made we come to consider the amendment. It is certain that the fundamental change which it makes is the omission of the substantially similar circumstances and conditions clause, thereby leaving the long and short-haul clause in a sense unqualified except in so far as the section gives the right to the carrier to apply to the Commission for authority "to charge less for longer than for shorter distances for the transportation of persons or property" and gives the Commission authority from time to time "to prescribe the extent to which such designated common carrier may

be relieved from the operation of this section." From the failure to insert any word in the amendment tending to exclude the operation of competition as adequate under proper circumstances to justify the awarding of relief from the long and short-haul clause and there being nothing which minimizes or changes the application of the preference and discrimination clauses of the second and third sections, it follows that in substance the amendment intrinsically states no new rule or principle but simply shifts the powers conferred by the section as it originally stood; that is, it takes from the carriers the deposit of public power previously lodged in them and vests it in the Commission as a primary instead of a reviewing function. In other words, the elements of judgment or so to speak the system of law by which judgment is to be controlled remains unchanged but a different tribunal is created for the enforcement of the existing law. This being true, as we think it plainly is, the situation under the amendment is this: Power in the carrier primarily to meet competitive conditions in any point of view by charging a lesser rate for a longer than for a shorter haul has ceased to exist because to do so, in the absence of some authority, would not only be inimical to the provision of the fourth section but would be in conflict with the preference and discrimination clauses of the second and third sections. But while the public power, so to speak, previously lodged in the carrier is thus withdrawn and reposed in the Commission the right of carriers to seek and obtain under authorized circumstances the sanction of the Commission to charge a lower rate for a longer than for a shorter haul because of competition or for other adequate reasons is expressly preserved and if not is in any event by necessary implication granted. And as a correlative the authority of the Commission to grant on request the right sought is made by the statute to depend upon the facts established and the judgment of that body in the exercise of a sound

legal discretion as to whether the request should be granted compatibly with a due consideration of the private and public interests concerned and in view of the preference and discrimination clauses of the second and third sections.

2. *The alleged repugnancy of the section as amended to the Constitution.*

But if the amendment has this meaning it is insisted that it is repugnant to the Constitution for various reasons which superficially considered seem to be distinct but which really are all so interwoven that we consider and dispose of them as one. The argument is that the statute as correctly construed is but a delegation to the Commission of legislative power which Congress was incompetent to make. But the contention is without merit. *Field* v. *Clark,* 143 U. S. 649; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *United States* v. *Heinszen,* 206 U. S. 370; *St. Louis, I. M. & S. Ry. Co.* v. *Taylor,* 210 U. S. 281; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177. We do not stop to review these cases because the mere statement of the contention in the light of its environment suffices to destroy it. How can it otherwise be since the argument as applied to the case before us is this: that the authority in question was validly delegated so long as it was lodged in carriers but ceased to be susceptible of delegation the instant it was taken from the carriers for the purpose of being lodged in a public administrative body? Indeed, when it is considered that in last analysis the argument is advanced to sustain the right of carriers to exert the public power which it is insisted is not susceptible of delegation, it is apparent that the contention is self-contradictory since it reduces itself to an effort to sustain the right to delegate a power by contending that the power is not capable of being delegated. In addition, however, before passing from the proposition we observe that when rightly appreciated the contention but challenges every decided case since the

passage of the Act to Regulate Commerce in 1887 involving the rightfulness of the exertion by a carrier of the power to meet competition as a means of being relieved from the long and short-haul clause of the fourth section before its amendment. While what we have already said answers it, because of its importance we notice another contention. As the power of carriers to meet competition and the relation of that right to non-competitive places may concern the fortunes of numberless individuals and the progress and development of many communities, it is said, to permit authority to be exerted concerning the subject without definite rules for its exercise will be to destroy the rights of persons and communities. This danger, the argument proceeds, is not obviated by declaring that the provisions of the second and third sections as to undue preference and discrimination apply to the fourth section since without a definition of what constitutes undue preference and discrimination, no definite rule of law is established but whim, caprice or favor will in the nature of things control the power exerted. And it is argued that this view is not here urged as the mere result of conjecture, since in the report of the Commission in this case it was declared in unequivocal terms as the basis of the order entered that the statute vested in the Commission a wide and undefined discretion by virtue of which it became its duty to see to it that communities and individuals obtained fair opportunities, that discord was allayed and commercial justice everywhere given full play. Let it be conceded that the language relied upon would have the far-reaching significance attributed to it if separated from its context, we think when it is read in connection with the report of which it but forms a part, and moreover when it is elucidated by the action taken by the Commission there is no substantial ground for holding that by the language referred to it was entitled to declare that the fourth section as amended conferred the uncon-

trolled exuberance of vague and destructive powers which
it is now insisted was intended to be claimed. In any
event, however, we must be governed by the statute and
its plain meaning. After all has been said the provisions
as to undue preference and discrimination, while involving
of course a certain latitude of judgment and discretion
are no more undefined or uncertain in the section as
amended than they have been from the beginning and
therefore the argument comes once more to the complaint
that because public powers have been transferred from
the carriers to the Commission, the wrongs suggested will
arise. Accurately testing this final result of the argument
it is clear that it exclusively rests upon convictions con-
cerning the impolicy of having taken from carriers, in-
timately and practically acquainted as they are with the
complex factors entering into rate making and moreover
impelled to equality of treatment as they must be by the
law of self interest operating upon them as a necessary
result of the economic forces to which they are subjected,
and having lodged the power in an official administrative
body which in the nature of things must act, however
conscientiously, from conceptions based upon a more
theoretical and less practical point of view. But this does
not involve a grievance based upon the construction or
application of the fourth section as amended but upon the
wisdom of the legislative judgment which was brought
into play in adopting the amendment, a subject with
which we have nothing in the world to do. It is said in the
argument on behalf of one of the carriers that as in sub-
stance and effect the duty is imposed upon the Commis-
sion in a proper case to refuse an application, therefore
the law is void because in such a contingency the statute
would amount to an imperative enforcement of the long
and short-haul clause and would be repugnant to the Con-
stitution. It is conceded in the argument that it has been
directly decided by this court that a general enforcement

of the long and short-haul clause would not be repugnant to the Constitution (*Louisville & N. R. Co.* v. *Kentucky*, 183 U. S. 503), but we are asked to reconsider and overrule the case and thus correct the error which was manifested in deciding it. But we are not in the remotest degree inclined to enter into this inquiry, not only because of the reasons which were stated in the case itself but also because of those already expounded in this opinion and for an additional reason which is that the contention by necessary implication assails the numerous cases which from the enactment of the Act to Regulate Commerce down to the present time have involved the adequacy of the conditions advanced by carriers for justifying their departure from the long and short-haul clause. We say this because the controversies which the many cases referred to considered and decided by a necessary postulate involved an assertion of the validity of the legislative power to apply and enforce the long and short-haul clause. How can it be otherwise since if this were not the case all the issues presented in the numerous cases would have been merely but moot, affording therefore no basis for judicial action since they would have had back of them no sanction of lawful power whatever.

3. *The jurisdiction of the court.*

The argument on this subject is twofold: (a) that as by the act creating the Commerce Court (June 18, 1910, c. 309, 36 Stat. 539) that court was endowed only with the jurisdiction "now possessed by circuit courts of the United States and the judges thereof" and provided that "nothing contained in this act shall be construed as enlarging the jurisdiction now possessed by the circuit courts of the United States or the judges thereof, that is hereby transferred to and vested in the commerce court" and as new powers were created by the subsequent amendment of the fourth section, therefore the Commerce Court had no jurisdiction. But we pass any extended discussion of

the proposition because it is completely disposed of by the construction which we have given to the amended section since that construction makes it clear that the effect of the amended fourth section was not to create new powers theretofore non-existing, but simply to redistribute the powers already existing and which were then subject to review. The argument affords another manifestation of the tendency to which we have already directed attention in this case to seek to maintain and aggrandize a power by insisting upon propositions which, if they were accepted, would raise the gravest question as to the constitutional validity of the asserted power, a question which we need not at all consider in view of the want of foundation for the exercise of the power claimed in the light of the plain meaning of the act to the contrary which we have already pointed out.

(b) The second contention as to jurisdiction yet further affords an illustration of the same mental attitude, since it rests upon the assumption that the order of the Commission refusing to grant the request of the carrier made under the fourth section was purely negative and hence was not subject to judicial inquiry. The contention therefore presupposes that the power which from the beginning has been the subject of judicial review by the mere fact of its transfer to the Commission was made arbitrary. Besides, the proposition disregards the fact that the right to petition the Commission conferred by the statute is positive and while the refusal to grant it may be in one sense negative, in another and broader view it is affirmative since it refuses that which the statute in affirmative terms declares shall be granted if only the conditions which the statute provides are found to exist. It is of course true as pointed out in *Interstate Commerce Commission* v. *Illinois Central Railroad*, 215 U. S. 452, 470, and since repeatedly applied that findings of fact made by the Commission within the scope of its administrative

duties must be accepted in case of judicial review, but that doctrine, as was also pointed out, does not relieve the courts in a proper case from determining whether the Constitution has been violated or whether statutory powers conferred have been transcended or have been exercised in such an arbitrary way as to amount to the exertion of authority not given, doctrines which but express the elementary principle that an investiture of a public body with discretion does not imply the right to abuse but on the contrary carries with it as a necessary incident the command that the limits of a sound discretion be not transcended which by necessary implication carries with it the existence of judicial power to correct wrongs done by such excess. And without pausing to particularly notice it, we observe in passing that what has just been said is adequate to meet the contention that as violations of the fourth section were made criminal no power existed to enjoin an order of the Commission made under that section because the consequence would be to enjoin criminal prosecution. The right which as we have seen the act gives to test the validity of orders rendered under the fourth section is not to be destroyed by a reference to a provision of that section. The two must be harmoniously enforced.

4. *The validity of the order in the light of the statute as interpreted.*

The order is in the margin.[1] The main insistence is

---

[1] FOURTH SECTION ORDER NO. 124.

In the matter of the applications, Nos. 205, 342, 343, 344, 349, 350, and 352, on behalf of the Transcontinental Freight Bureau, by R. H. Countiss, agent, for relief from the provisions of the fourth section of the act to regulate commerce as amended June 18, 1910, with respect to rates made from eastern points of shipment which are higher to intermediate points than to Pacific coast terminals.

COMMODITY RATES.

These applications, as above numbered, on behalf of the Transcontinental Freight Bureau, ask for authority to continue rates from east-

that there was no power after recognizing the existence
of competition and the right to charge a lesser rate to the
competitive point than to intermediate points to do more
than fix a reasonable rate to the intermediate points,
that is to say, that under the power transferred to it by
the section as amended the Commission was limited to

---

ern points of shipment which are higher to intermediate points in
Canada and in the States of Arizona, New Mexico, Idaho, California,
Montana, Nevada, Oregon, Utah, and Washington, and other States
east thereof, than to Pacific coast terminals.

Full investigation of the matters and things involved in these peti-
tions, in so far as they concern westbound commodity rates, having
been had,

*It is ordered,* That for the purposes of the disposition of these applica-
tions, the United States shall be divided into five zones, as described
in the following manner:

(The transcontinental groups hereinafter described are as specified
in R. H. Countiss, agent's, transcontinental Tariff I. C. C. No. 929.)

Zone No. 1 comprises all that portion of the United States lying west
of a line called Line No. 1, which extends in a general southerly direction
from a point immediately east of Grand Portage, Minn.; thence south-
westerly, along the northwestern shore of Lake Superior, to a point
immediately east of Superior, Wis.; thence southerly, along the eastern
boundary of Transcontinental Group F, to the intersection of the
Arkansas and Oklahoma State line; thence along the west side of the
Kansas City Southern Railway to the Gulf of Mexico.

Zone No. 2 embraces all territory in the United States lying east of
Line No. 1 and west of a line called Line No. 2, which begins at the
international boundary between the United States and Canada, im-
mediately west of Cockburn Island, in Lake Huron; passes westerly
through the Straits of Mackinaw; southerly, through Lake Michigan
to its southern boundary; follows the west boundary of Transconti-
nental Group C to Paducah, Ky.; thence follows the east side of the
Illinois Central Railroad to the southern boundary of Transcontinental
Group C; thence follows the east boundary of Group C to the Gulf of
Mexico.

Zone No. 3 embraces all territory in the United States lying east of
Line No. 2 and north of the south boundary of Transcontinental Group
C, and on and west of Line No. 3, which is the Buffalo-Pittsburg line
from Buffalo, N. Y., to Wheeling, W. Va., marking the western bound-

ascertaining the existence of competition and to authorizing the carrier to meet it without any authority to do more than exercise its general powers concerning the reasonableness of rates at all points. But this proposition is directly in conflict with the statute as we have construed it and with the plain purpose and intent manifested by its enactment. To uphold the proposition it would be necessary to say that the powers which were essential to the vivification and beneficial realization of the authority transferred had evaporated in the process of transfer and hence that the power perished as the result of the act by which it was conferred. As the prime

---

ary of Trunk Line Freight Association territory; thence follows the Ohio River to Huntington, W. Va.

Zone No. 4 embraces all territory in the United States east of Line No. 3 and north of the south boundary of Transcontinental Group C.

Zone No. 5 embraces all territory south and east of Transcontinental Group C

*It is further ordered,* (1) That those portions of the above-numbered applications that request authority to maintain higher commodity rates from points in Zone No. 1 to intermediate points than to Pacific coast terminals be, and the same are hereby, denied, effective November 15, 1911; (2) that petitioners herein be, and they are hereby, authorized to establish and maintain, effective November 15, 1911, commodity rates from all points in zones numbered 2, 3, and 4, as above defined, to points intermediate to Pacific coast terminals that are higher to intermediate points than to Pacific coast terminals; provided, that the rates to intermediate points from points in zones numbered 2, 3, and 4 shall not exceed the rates on the same commodities from the same points of origin to the Pacific coast terminals by more than 7 per cent from points in Zone No. 2, 15 per cent from points in Zone No. 3, and 25 per cent from points in Zone No. 4.

The commission does not hereby approve any rates that may be established under this authority, all such rates being subject to complaint, investigation, and correction if they conflict with any other provisions of the act.

By the commission:

[SEAL]                                        JUDSON C. CLEMENTS,
                                                      *Chairman.*

object of the transfer was to vest the Commission within the scope of the discretion imposed and subject in the nature of things to the limitations arising from the character of the duty exacted and flowing from the other provisions of the act with authority to consider competitive conditions and their relation to persons and places, necessarily there went with the power the right to do that by which alone it could be exerted, and therefore a consideration of the one and the other and the establishment of the basis by percentages was within the power granted. As will be seen by the order and as we have already said for the purpose of the percentages established zones of influence were adopted and the percentages fixed as to such zones varied or fluctuated upon the basis of the influence of the competition in the designated areas. As we have pointed out though somewhat modified the zones as thus selected by the Commission were in substance the same as those previously fixed by the carriers as the basis of the rate-making which was included in the tariffs which were under investigation and therefore we may put that subject out of view. Indeed, except as to questions of power there is no contention in the argument as to the inequality of the zones or percentages or as to any undue preference or discrimination resulting from the action taken. But be this as it may, in view of the findings of the Commission as to the system of rates prevailing in the tariffs which were before it, of the inequalities and burdens engendered by such system, of the possible aggrandizement unnaturally beyond the limits produced by competition in favor of the competitive points and against other points by the tariff in question, facts which we accept and which indeed are unchallenged, we see no ground for saying that the order was not sustained by the facts upon which it was based or that it exceeded the powers which the statute conferred or transcended the limits of the sound legal discretion which it lodged in

the Commission when acting upon the subject before it.

It results that the Commerce Court in enjoining the order of the Commission was wrong and its decree to that end must therefore be reversed and the case be remanded to the proper District Court with directions to dismiss the bill for want of equity.

*Reversed.*