MERCHANTS' & MANUFACTURERS' TRAFFIC ASS'N OF SACRAMENTO et al. v. UNITED STATES et al.

(District Court, N. D. California, Second Division.   December 15, 1915.)

No. 191.

1. COMMERCE ⬾93—INTERSTATE COMMERCE COMMISSION—ORDERS—RIGHT TO SUE.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 13. 24 Stat. 383, as amended by Act June 18, 1910, c. 309, § 11, 36 Stat. 550 (Comp. St. 1913, § 8581), provides that any association, body politic, or municipal organization, complaining of anything done or omitted to be done by any carrier subject thereto, may apply to the Commission by petition. Act Feb. 19, 1903, c. 708, § 2, 32 Stat. 848 (Comp. St. 1913, § 8598), provides that in any proceeding for the enforcement of statutes relating to interstate commerce, whether instituted before the Commission or in any Circuit Court it shall be lawful to include as parties all persons interested or affected, and that investigations, decrees, etc., may be made with reference to and against them. Equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) provides that all persons having an interest in the subject of the action and in obtaining the relief demanded may join as plaintiffs, and that persons having a united interest must be joined on the same side as plaintiffs or defendants. Equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix) provides that when the question is one of common or general interest to many persons, constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole. Held, that where an order of the Interstate Commerce Commission authorized, and a tariff filed thereunder provided, higher rates to four certain cities than to certain other cities, one of such cities, representing the interest of its citizens, and traffic associations formed for the purpose of representing jobbers and merchants in the three other cities, could maintain a suit to enjoin the enforcement of such order and tariff, as they were within the rule that bills may be filed in the name of unincorporated associations and parties in behalf of others similarly situated, and moreover the equity rules seem to contemplate such a suit for the common

⬾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

benefit of all, where the parties are numerous and have a common or general interest.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 144; Dec. Dig. ☞93.]

2. COMMERCE ☞86—CHARGES—LONG AND SHORT HAULS—INTERSTATE COMMERCE COMMISSION.

Act Feb. 4, 1887, c. 104, § 4, 24 Stat. 380, as amended by Act June 18, 1910, c. 309, § 8, 36 Stat. 547 (Comp. St. 1913, § 8566), makes it unlawful for a carrier to charge a higher rate for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, provided, however, that upon application to the Interstate Commerce Commission the carrier may in special cases, after investigation, be authorized to charge less for longer than for shorter distances. Shortly prior to the amendment the Commission ordered certain changes in west-bound rates to points in Nevada, and thereafter transcontinental carriers made applications for authority to continue the practice of making commodity rates to the Pacific Coast lower than to Nevada points. Sacramento, Stockton, San Jose, and Santa Clara had long been designated as Pacific Coast terminals, and the applications did not propose to disturb the terminal or short haul rates to these points, and at no time in the ensuing proceedings did they ask the Commission to suspend the long and short haul clause with respect to these points; but the Commission removed these points from the class of Pacific Coast terminals and increased the west-bound rates to those points above the rates to San Francisco and other ports of call of steamship lines. *Held*, that the Commission had no power to suspend the long and short haul clause in this respect without an application being made to it by the carriers for that purpose and a hearing upon that particular application as in a special case, and the order to that extent was therefore void.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 140; Dec. Dig. ☞86.]

Bledsoe, District Judge, dissenting.

In Equity. Suit by the Merchants' & Manufacturers' Traffic Association of Sacramento and others against the United States and others. On application for an injunction to restrain the Interstate Commerce Commission from enforcing certain orders of the Commission under Act Oct. 22, 1913, c. 32, § 1, 38 Stat. 208, entitled "An act making appropriations to supply urgent deficiencies in appropriations for the fiscal year nineteen hundred and thirteen, and for other purposes." Interlocutory injunction issued.

John E. Alexander, of San Francisco, Cal., for petitioners.

Blackburn Esterline, Sp. Asst. Atty. Gen. (John W. Preston, U. S. Atty., of San Francisco, Cal., on the brief), for the United States.

Joseph W. Folk, of Washington, D. C., for Interstate Commerce Commission.

C. W. Durbrow and Allan P. Matthew, both of San Francisco, Cal., and E. W. Camp, of Los Angeles, Cal., for respondents.

Before MORROW, Circuit Judge, and DOOLING and BLEDSOE, District Judges.

MORROW, Circuit Judge. The petitioners are applying to this court, upon the bill of complaint and affidavits, for an interlocutory injunction to restrain in part an order of the Interstate Commerce Commission, dated April 30, 1915, and the tariff filed by certain of the

transcontinental rail carriers pursuant to said order (Supplement 16 to Transcontinental Freight Bureau West-Bound Tariff No. 1–N), in so far as the said order charges for west-bound transcontinental commodities destined to Sacramento, Stockton, San Jose, and Santa Clara any greater amount than is charged for the transportation of like commodities to San Francisco or Oakland.

[1] A preliminary motion to dismiss the bill has been made by the United States on grounds that appear to be sufficiently stated in the objections that the petitioners do not bring the suit as common carriers or as shippers; that they have no such interest in the orders of the Interstate Commerce Commission sought to be annulled and enjoined as to enable them to maintain the suit; that it does not appear that they will sustain irreparable injury, or any injury, by reason of any orders of the Commission made subject of complaint; and that the petitioners have no standing in a court of equity to maintain the suit.

Three of the petitioners are traffic associations formed for the purpose of representing jobbers and merchants located at Sacramento, Stockton, and San Jose in traffic matters in which all the parties represented are interested. The remaining petitioner, Santa Clara, is a municipal corporation representing the interests of the citizens of that municipality. All of the petitioners are authorized by section 13 of the Act to Regulate Commerce (Act Feb. 4, 1887, 24 Stat. 379) to apply to the Interstate Commerce Commission by petition for relief in certain matters; that is to say, they may become parties to certain proceedings before the Interstate Commerce Commission, thus recognizing their right to represent the interest of others before that body. And it is further provided in the section that:

"No complaint shall at any time be dismissed because of the absence of direct damage to the complainant."

It is further provided, in section 2 of the Act to Further Regulate Commerce with Foreign Nations and Among the States (Act Feb. 19, 1903, 32 Stat. pt. 1, p. 847):

"That in any proceeding for the enforcement of the provisions of the statutes relating to interstate commerce, whether such proceedings be instituted before the Interstate Commerce Commission or be begun originally in any Circuit Court of the United States, it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the rate, regulation, or practice under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."

The purpose of these statutes is plainly to meet a situation and bring in all parties interested in the controversy, to the end that the entire question involved may be settled and determined in the one proceeding. Such being the purpose, we see no objection to classes of persons similarly situated being represented by an association or other organization and coming into the controversy under the common name. This, we think, brings this case within the well-known rule that bills may be filed in the name of an unincorporated association,

and by parties on behalf of others similarly situated. In Foster's Federal Practice (5th Ed.) § 114, the rule is stated as follows:

"*Class Suits.*—When a number of persons have a common interest in a thing which is the subject of litigation, and in some instances when a number of persons have a common interest in a question which is before the court for decision, one or more may sue or be sued in behalf of the rest. Judge Story divides the first of these divisions into two: '(1) When the question is one of a common and general interest, and one or more sue or defend for the benefit of the whole; and (2) when the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interests of the whole.' But there seems to be no reason for treating the two classes separately. They are called 'class suits,' 'creditors' suits,' or 'stockholders' suits,' as the case may be."

Moreover, the equity rules seem to contemplate such a suit for the common benefit of all where the parties are numerous and have a common or general interest. Equity rule No. 37 (198 Fed. xxviii, 115 C. C. A. xxviii) provides:

"All persons having an interest in the subject of the action and in obtaining the relief demanded may join as plaintiffs and persons having a united interest must be joined on the same side as plaintiffs or defendants."

Equity rule No. 38 (198 Fed. xxix, 115 C. C. A. xxix) provides that:

"When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

We think under these rules this action may be maintained by the petitioners. The motion to dismiss is therefore denied.

[2] After the passage of the Act of February 4, 1887, to Regulate Commerce (24 Stat. 379), it became unlawful, under section 4 of the act, for a carrier to charge or receive any greater compensation in the aggregate for the transportation of passengers or like kind of property for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance. But there was a qualification provided in the statute that the transportation for the shorter and longer distances must be under substantially similar circumstances and conditions. There was a further provision that upon *application* to the Interstate Commerce Commission a carrier might in *special cases after investigation* by the Commission be authorized to charge less for the longer than for the shorter distance.

The controversy in the present case has its origin in proceedings arising out of an application made to the Interstate Commerce Commission by the Railroad Commission of Nevada. Prior to that application, all points in Nevada (which points are designated as *intermountain points*) had been charged much higher rates on both classes of west-bound freight, viz. freight designated as *class freight* and freight designated as commodities, than had been charged to Pacific Coast terminals. Sacramento, Stockton, San Jose, and Santa Clara, as well as other points in California, had long prior to such time been designated as *"Pacific Coast terminals"* and were such at the time of the

application to the Interstate Commerce Commission by the Railroad Commission of Nevada. The prayer of the Nevada application was:

"Nevada asks that she be given rates as low as those given to Sacramento."

Sacramento was the nearest Pacific Coast terminal to Nevada, and the former system of rate-making for points in Nevada was to charge the full rate to the nearest Pacific Coast terminal and then charge in addition thereto the full local back-haul rate to the point of destination. Thus Nevada points were charged for a shorter distance the full terminal rate for a longer distance and, in addition, the local back-haul rate to the point of delivery. The petition was that Nevada might have the full benefit of the long and short haul clause of the fourth section of the Commerce Act. The petition was not granted in full, but the Commission did establish *class rates* to be charged to certain Nevada points. The rates to points outside of Nevada were not considered. In fixing the *class rates,* the Commission stated that additional data as to *commodity rates* would be secured before an order would be made relative to such rates.

The findings and conclusions upon the foregoing application, and the order pursuant thereto, were entered of record on June 6, 1910. On June 18, 1910, Congress amended the fourth section of the Act to Regulate Commerce by striking out the clause, "under substantially similar circumstances and conditions." The provision relating to applications to the Commission by the carriers for authority to depart from the long and short haul clause of the section was amended slightly so as to read:

"Provided, however, that upon *application* to the Interstate Commerce Commission such common carrier may in *special cases, after investigation,* be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section."

## Pacific Coast Terminals.

Prior to this amendment the construction of the fourth section had been that the rail carriers had the primary right to determine as to what constituted "under substantially similar circumstances and conditions," and when a departure could be made from the long and short haul requirements of section 4 because of a dissimilarity of circumstances and conditions. Intermountain Rate Cases, 234 U. S. 476, 482, 34 Sup. Ct. 986, 58 L. Ed. 1408. After the amendment, various transcontinental lines made applications to the Interstate Commerce Commission for authority to continue the then practice of making commodity rates to the Pacific Coast lower than to intermediate, or Nevada, points. The "Pacific Coast" here referred to was what was then known as "Pacific Coast terminals," and included, as before stated, Sacramento, Stockton, San Jose, and Santa Clara, and other points in California. The applications of the carriers did not propose to disturb the terminal or short-haul rates to these points. In other words, there was no application on the part of the carriers to suspend the long and short haul clause of section 4 with respect to these terminal

points.   See Fourth Section Applications Nos. 205, 342, 343, 344, 349, 350, and 352, Commodity Rates to the Pacific Coast Terminals and Intermediate Points, decided January 29, 1915, 32 Interst. Com. Com'n R. 611.

### Blanket Rates from the Missouri River to the Atlantic Ocean.

The Interstate Commerce Commission, in the report just cited, referring to the history of these applications, say:

"Fourth Section Order No. 124 recognized the existence of a wide blanket of rates as to points of origin extending from the Missouri river to the Atlantic Ocean on traffic to the Pacific Coast, while it did not provide for such blanketing of rates to points in the intermediate territory."

Then, after explaining the effect of this blanketing of rates from the Missouri river to the Atlantic Ocean, the Commission say:

"Upon the whole record we are of the opinion that these carriers are justified in the maintenance of a blanket as to points of origin on rates to the Pacific Coast, and that this practice carries with it no necessity or obligation of blanketing the same territory of origin in establishing rates to intermediate points."

The "intermediate points" referred to in this report are the intermountain or Nevada points; but the carriers were to be permitted to maintain blanket rates to Pacific Coast terminals.

### Back-Haul Territory.

The Commission thereupon proceed to designate a territory on the Pacific Coast as back-haul territory, and say:

"We have heretofore described this territory as lying along the main lines of these railways immediately east of the terminals.   For the purpose of this report this will be called the back-haul territory."

The Commission then make the suggestion that carriers readjust rates to back-haul points by either adding to the full terminal rates something less than full locals from terminal to destination, or by the publication of basing rates to the terminals, less than the terminal rates, to be used in connection with local rates from the terminals in determining rates to intermediate points.   The Commission say:

"The record in this case is not sufficient to afford a basis warranting the Commission in prescribing the exact measure of these rates.   We shall therefore make no order in regard thereto at this time."

The Commission continue:

"*No evidence has been presented in this case to show that it is necessary to apply the coast terminal rates to any points except the ports of call on the Pacific Coast at which the Atlantic-Pacific steamship lines deliver freight.* We shall authorize these carriers to establish the rates proposed to these ports upon all the articles in the list, excepting those to which exceptions have been noted."

This is the first intimation in these proceedings that the *Pacific Coast terminals* were to be reduced to "the ports of call on the Pacific Coast at which the Atlantic Pacific steamship lines deliver freight."   No carrier had made application for such an order, and its consideration by the Commission was not had in any special case.   It meant the

elimination of Sacramento, Stockton, San Jose, and Santa Clara from Pacific Coast terminals and their transfer to the newly created back-haul territory; such transfer resulting, as we shall presently see, in authorizing the carrier to charge a greater compensation for a shorter distance than for a longer distance at the *point of destination,* and in addition, to charge a still greater compensation if the *point of origin* should be between the Missouri river and the Atlantic Ocean; this increased charge or compensation at the point of origin resulting from the withdrawal of the blanket rates from back-haul and intermediate territory and substituting a differential therefor under a classification by zones. We find no application by any carrier for authority to charge more from the blanketed territory between the Missouri river and the Atlantic Ocean to Sacramento, Stockton, San Jose, and Santa Clara than to San Francisco and Oakland.

The Commission said further in their report:

"We shall expect the carriers within 60 days from date of service hereof to submit to the Commission such plan for adjustment of rates to the back-haul points as they may desire. Should the carriers submit no such plan within this time, the Commission will undertake such investigation as to these rates as will enable it to enter a proper order with regard thereto."

In response to this invitation of the Commission, the transcontinental lines to California terminals proposed for the so-called back-haul territory to deduct from the terminal commodity rates 7 cents per 100 pounds, carloads, and 10 cents per 100 pounds, less than carloads, for basing rates, and to add thereto the full local rate from nearest terminal to destination. This was to apply eastward from the terminal until the point is reached at which the prescribed maximum rate is the same or less; the rate to a back-haul point not to be less than that to the terminal point.

In the report of the Interstate Commerce Commission dated April 30, 1915 (34 Interst. Com. Com'n R. 13), this proposal of the carriers was not approved; but in lieu thereof, carriers were ordered to construct such rates *by adding to the terminal rates not more than 75 per cent. of the local rates from the nearest terminal to destination,* or by adding arbitraries to the terminal rates varying with distance from the ports, such arbitraries to be not more than 75 per cent. of the local rates, the aggregate not to exceed the maximum prescribed to intermediate points mentioned in the order.

It was further ordered that in the observance of this order as to rates on Schedule C commodities, the Pacific Coast terminals should consist of  *  *  *  San Francisco and Oakland, Cal.;  *  *  *  Sacramento, Stockton, San Jose, and Santa Clara being omitted from the order as Pacific Coast terminals.

We are advised in these proceedings that the proposal of rates for Schedule C commodities as made by the carriers for back-haul territory, for such points as Sacramento, Stockton, San Jose, and Santa Clara was the equivalent of terminal rates for San Francisco and Oakland; and such we understand to be the statement contained in the report of the Commission. Commenting upon the plan submitted by the carriers, the Commission say:

"The plan for constructing rates to back-haul points proposed by the lines leading to the California terminals would create a zone contiguous to the terminals to which terminal rates would apply. The extent of this zone would be limited by the distances to which local rates of 7 cents, carloads, and 10 cents, less than carloads, would reach. *It would, however, in substance include all of the points that have heretofore been accorded terminal rates.*"

In other words, points previously designated as terminal points would continue to have the equivalent of terminal rates. There was, therefore, no application on the part of the carriers, under section 4 of the Act to Regulate Commerce, to be authorized to charge less for a longer (to San Francisco and Oakland) than for a shorter distance (to Sacramento, Stockton, San Jose, and Santa Clara). With respect to differentials in the prescribed zone rates, the Commission say:

"In making rates from territories east of the Missouri river the carriers were authorized to add to the rates made from the Missouri river to intermediate points differentials of 25, 40, and 55 cents per 100 pounds from Chicago, Pittsburgh, and New York, respectively."

Here was a further increase of rates for Sacramento, Stockton, San Jose, and Santa Clara if the commodity originated east of the Missouri river; 25 cents per 100 pounds if the commodity were shipped from Chicago, 40 cents per 100 pounds if the commodity were shipped from Pittsburgh, and 55 cents per 100 pounds if the commodity were shipped from New York. No application was ever made by the carriers for the increase arising from such a change from blanket to zone rates east of the Missouri river.

Our attention is called to another provision of this order of April 30, 1915. In the applications made by the carriers, commodities were divided into three classes designated as Schedules A, B, and C, each containing a different class of commodity. The order of January 29, 1915, referred only to Schedule C commodities, the order specifically stating in the first sentence that a hearing had been had "with reference to the justification for the additional relief sought by the carriers *respecting the rates on the commodities listed under Schedule C.*" It appears, however, that the order of April 30, 1915, has the effect of assigning Schedule B commodities to a per cent. of increase prescribed in zone rates, as follows: Seven per cent. from points in zone 2, 15 per cent. from points in zone 3, and 25 per cent. from points in zone 4. This feature of the transcontinental tariff was never mentioned in any application, and there was never a hearing of any kind upon that subject.

The effect of this feature of the order is this: It authorizes the carriers to charge more for the shorter haul to Sacramento, Stockton, San Jose, and Santa Clara than for the longer haul to San Francisco and Oakland on both Schedules B and C commodities, without any application having been made by the carriers for such authority. The order of April 30, 1915, as a whole, increases the transcontinental rates to Sacramento, Stockton, San Jose, and Santa Clara, over the previously existing rates for commodities in Schedules B and C, in the following particulars: (1) An increase of rates on such commodities by the transfer of the points named from terminals to back-haul

territory; and (2) an increase of rates from points of origin east of the Missouri river by taking from such points the blanket rates of the Eastern territory.

The discussion of the questions involved in these proceedings has taken a wide range; but we are of the opinion that the only question we have to deal with in this case is the statutory power of the Interstate Commerce Commission. Had the Commission, in the absence of an application by the carriers, the statutory power to make the order it did? Can the Commission suspend the long and short haul clause of section 4 of the Act to Regulate Commerce without an application being made to it by the carriers for that purpose and a hearing upon that particular application as in a special case? We are of the opinion that this is beyond the statutory power of the Commission; and such we understand to be the decision of the Supreme Court in United States v. Louis. & Nash. R. R., 235 U. S. 314, 322, 35 Sup. Ct. 113, 59 L. Ed. 245.

An interlocutory injunction will therefore issue, restraining the respondents from further enforcing the order of April 30, 1915, in so far as it increases west-bound transcontinental freight rates on Schedules B and C commodities to Sacramento, Stockton, San Jose, and Santa Clara.

BLEDSOE, District Judge. I am unable to concur with my Associates in this case. The decree to be entered pursuant to their conclusions will enjoin the respondents from further enforcing the order of the Interstate Commerce Commission dated April 30, 1915, "in so far as it increases west-bound transcontinental freight rates on Schedule B and C commodities to Sacramento, Stockton, San Jose, and Santa Clara." In all other respects, and with reference to all other communities in the so-called back-haul territory (hundreds in number, obviously), the order is to stand. If the order lacks validity because in excess of the jurisdiction conferred upon the Commission, it should be annulled, and its operation stayed, in toto.

I cannot acquiesce, however, in the conclusion that the order was in excess of the jurisdiction conferred upon the Commission. By the majority opinion such invalidity is made to rest upon the single fact that no "application" for the order had been made, and that, under the construction given to section 4 of the Act to Regulate Commerce, as announced in 235 U. S. 314, 322, 35 Sup. Ct. 113, 59 L. Ed. 245, the making of such "application" is a necessary pre-requisite to action on the part of the Commission. I do not so construe the section and do not so read the decision.

It is clear that Congress intended that the general rule should be that a common carrier should not charge more for a shorter than for a longer haul over the same route in the same direction. It was seen, however, that occasions would doubtless arise justifying, if not demanding, exceptions to this general rule, and it was therefore provided that:

"Upon application to the Interstate Commerce Commission, such common carrier may, in special cases, after investigation, be authorized by the Commission to charge less for longer than for shorter distances."

Now the thing that Congress was insisting upon as a condition precedent to the creating of an exception to the general rule was not the making of an application by the carrier, but the *granting of consent by the Commission.* It was the judgment of the Commission, after investigation, that was to warrant the setting aside of the statutory rule, and the provision for the making of an "application" was intended merely as a means of securing such investigation and judgment. The making of an application by the carrier was of the form, perhaps, but not of the substance, of the proceeding; it was a mere means to an end, and should not, in my judgment, be confounded with the end itself. The large purpose of the amendment to section 4 was to substitute the *judgment of the Commission* for that of the carrier, as to the necessity for a violation of the long and short haul clause of the Commerce Act. The amendment took "from the carriers the deposit of public power previously lodged in them and vested it in the Commission as a primary instead of a reviewing function." Intermountain Cases, 234 U. S. 476, 34 Sup. Ct. 986, 58 L. Ed. 1408.

If no order of the Commission providing for an exception to the general rule respecting the long and short haul clause is valid unless preceded by an "application" therefor, then, in logic, the application must have been for the order as precisely made, and in consequence the Commission could make no order respecting relief from the controlling provisions of section 4 save such order as had been specially "applied" for. The net result of this would be to reduce the Commission almost to a mere automaton, with no power save to say yes or no. This illy comports with the "primary instead of a reviewing function" vested in the Commission by the amendment, and is, as I read it, in direct contravention of the holding in the Intermountain Cases, supra.

Indeed, the Supreme Court in those cases, quoting the language of section 4 immediately following the clause just referred to, say that the section as amended gives to the carrier the right to apply for authority to charge less for the longer haul, "and gives the Commission authority, from time to time, 'to prescribe the extent to which such designated common carrier may be relieved from the operation of this section.'" The Commission could hardly be said to be vested with the right to exercise its authority "from time to time," if such exercise was absolutely dependent, as held in the majority opinion herein, upon the filing of an "application" with it.

Moreover, by section 13 of the Act to Regulate Commerce as amended at the same time section 4 was amended, it is specially provided:

"* * * And the Interstate Commerce Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made to or before said Commission by any provision of this act, or concerning which *any question* may arise under *any of the provisions of this act,* or relating to the *enforcement of any* of the provisions of this act. And the said Commission shall have the same powers and authority to proceed with *any* inquiry *instituted on its own motion* as though it had been appealed to by complaint or petition under any of the provisions of this act, including the power to make and enforce any order or orders in the case, or relating to

the matter or thing concerning which the inquiry is had excepting orders for the payment of money." (Italics mine.)

Language could hardly be more comprehensive. If this section does not give to the Commission primary and plenary authority to do the thing complained of in this proceeding, it is difficult for me to conceive of language possessing that efficacy. The suggestion has been made that because the word "application" was not used along with "complaint" and "petition" in the last sentence that therefore there was no intention to accord to the Commission independent authority to conduct an investigation in any of the instances where provision was made for the filing of an application. It is a sufficient answer to this, however, to say that the first sentence quoted contains no such qualifying phrases, and of itself would seem to afford ample authority for the action under review, even if the last sentence, containing the reference to "complaint" and "petition" and omitting any reference to "application," be completely disregarded. In addition, "application" and "petition" are synonymous terms; in fact, the Century Dictionary defines a "petition" as a "written *application*" for relief. It were in furtherance of the general remedial spirit of the Act to Regulate Commerce to construe, if such construction be necessary, the word "petition" to include and embrace "application."

Section 15 of the Commerce Act, as amended at the same time as above indicated, provides:

"That whenever, after full hearing upon a complaint made as provided in section thirteen of this act, *or after full hearing under an order for investigation* and hearing made by the Commission *on its own initiative (either in extension of any pending complaint or without any complaint whatever)*, the Commission shall be of opinion that any individual or joint rates or charges whatsoever demanded, charged, or collected by any common carrier or carriers subject to the provisions of this act for the transportation of persons or property or for the transmission of messages by telegraph or telephone as defined in the first section of this act, or that any individual or joint classifications, regulations, or practices whatsoever of such carrier or carriers subject to the provisions of this act are *unjust or unreasonable or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of this act, the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate or rates, charge or charges, to be thereafter observed in such case as the* maximum to be charged, and *what individual or joint classification, regulation, or practice is just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds the same to exist, and* shall not thereafter publish, demand, or collect any rate or charge for such transportation or transmission in excess of the maximum rate or charge so prescribed, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed." (Italics mine.)

This provision is all-comprehensive in its language and purpose, and to me is in emphatic disaffirmance of the position assumed in the majority opinion. It seems to have been so considered in a proceeding somewhat analogous to this reported in Philadelphia & R. R. Co. v. United States (D. C.) 219 Fed. 988, 991, 992.

There is no requirement anywhere that notice of the application referred to in section 4 shall be given to any one. The hearings had and orders made in the proceeding under consideration could and

probably would have taken exactly the same course they did take even if the formal "application" whose absence is now relied on, had been made. The absence of any requirement of notice, is not of course an argument that an application should not have been made, but it is peculiarly persuasive with me to the effect that Congress did not intend that the making of an application for relief should constitute a jurisdictional prerequisite to the granting of relief. If it had, it would have provided for some notice of the application to be given. The absence of any provision for notice, the empowering of the Commission to afford relief "from time to time," together with the comprehensive phraseology of section 13 and 15, supra, lead me to conclude that the hearing, investigation, and order countenanced by the act are to be had "upon application" of the carrier, or on the initiative of the Commission as the circumstances may demand.

Conceding, however, that the making of an application is a jurisdictional prerequisite to the charging of a higher rate for a shorter haul, the filing of the tariffs with the Commission by the carriers involved, pursuant to the order of April 30, 1915, could in itself reasonably be construed as such application. (It appears from the record that such tariffs were filed, and, being approved by the Commission, have been officially promulgated.) Considering the fact that no notice of the application has to be given, it would seem that an application made subsequent and pursuant to a hearing, if approved by the Commission, would possess all the efficacy of one made before the hearing. If the carriers had not filed their tariffs pursuant to the order of April 30th, and had themselves objected to that order, a much stronger case than is here would have been presented. This, as I read it, however, was the course followed in the Intermountain Cases under analogous circumstances, and yet there the order of the Commission was expressly affirmed.

In the only case cited in the main opinion (235 U. S. 314, 322, 35 Sup. Ct. 113, 59 L. Ed. 245) the carrier was objecting to a ruling of the Commission holding a certain rebilling privilege violative of the Act to Regulate Commerce. In reversing a decision of the Commerce Court overruling the Commission, the Supreme Court held that under section 4 as amended no such rebilling privilege was valid until the consent of the Commission to that end was obtained. There was no case, as here, of such consent having been given, and in consequence I cannot see anything in the decision declarative of the proposition that such consent, if given, would have been inefficacious if it had not been preceded by a formal application.

In the case at bar it stands as indubitably true that a hearing and extended investigation was had by the Commission, and that their conclusions embraced in the order complained of were the result of most careful consideration. The evidence upon which the order was based is not before us, but the sworn answer of the Commission is to the effect that the order was made upon ample evidence, and on this hearing we must assume such to be the case.

Section 13 of the Commerce Act affords ample machinery for the Commission upon application to it to remedy any injustice done to

these complainants. They have made no such application and in that behalf have never submitted their claims or exhibited the prejudice suffered by them to the Commission. They were not parties to the proceedings leading up to the order of April 30th and were not represented thereat. It may be that as to them the order is full of injustice; but if such be the fact it must be assumed that upon a showing thereof, pursuant to the terms of section 13, complete relief would be afforded them by the Commission. Until at least they have made the application and have met with refusal, they are not in a position to ask relief at the hands of this court.

In my opinion the application for temporary injunction should be denied.