LEHIGH VALLEY R. CO. v. UNITED STATES.

(District Court, E. D. Pennsylvania. May 12, 1916.)

No. 1521.

1. COMMERCE ⬡⟊91—COMMON OWNERSHIP OF RAIL AND WATER CARRIERS—REVIEW OF ORDERS OF INTERSTATE COMMERCE COMMISSION.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 5, 24 Stat. 380, as amended by Panama Canal Act Aug. 24, 1912, c. 390, § 11, 37 Stat. 566 (Comp. St. 1913, §§ 8567, 8568), makes it unlawful for any railroad company subject to the provisions of the act after July 1, 1914, to own, operate, control, or have any interest in any common carrier by water with which its railroad does or may compete for traffic, under penalty of a fine for each day's violation. By a further provision it confers on the Interstate Commerce Commission jurisdiction to determine, on application of any railroad company also owning or controlling a water line, the questions of fact as to competition or possibility of competition between the rail and water lines, and upon certain findings to make an order extending the time during which the water service may be continued after July 1, 1914. In all such cases the order of the commission is made final. *Held*, that an order of the commission pursuant to the statute dismissing the petition of a carrier for such an extension does not require a dissolution of the connection between the rail and water service, but merely leaves the petitioner subject to the operation of the statute, and that a suit in

---

the District Court to enjoin enforcement of the commission's order is not an appropriate proceeding to review its action.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 143; Dec. Dig. ☞91.]

2. COMMERCE ☞97—COMMON OWNERSHIP OF RAIL AND WATER CARRIERS— REVIEW OF ORDERS OF INTERSTATE COMMERCE COMMISSION.

Under the jurisdiction so conferred on the commission to determine the questions of fact as to actual or potential competition between the rail and water service of a petitioner and the provision making its order final, such order is reviewable by the courts only so far as to ascertain that the fundamental requirements of a hearing have been observed, and that the findings were not arbitrary, but based on relevant and substantial evidence; its weight and effect being for the commission.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 147; Dec. Dig. ☞97.]

3. CONSTITUTIONAL LAW ☞62—COMMON OWNERSHIP OF RAIL AND WATER CARRIERS—CONSTITUTIONALITY OF STATUTE.

In the exercise of the jurisdiction so conferred, the commission, although it finds that the two carriers do or may compete, may nevertheless permit the common control to continue if the public interest will be promoted thereby and if the common control does not injure existing or potential water competition, and the authority to make such an order, based on findings of fact in each particular case, is not unconstitutional as a delegation of legislative power.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102; Dec. Dig. ☞62.]

In Equity. Suit by the Lehigh Valley Railroad Company against the United States, and the Interstate Commerce Commission intervened. Decree dismissing bill.

John G. Johnson, of Philadelphia, Pa., and R. W. Barrett and E. H. Boles, both of New York City, for plaintiff.

E. Marvin Underwood, Asst. Atty. Gen., and Edward W. Hines, of Washington, D. C., Asst. Atty. Interstate Commerce Commission. Blackburn Esterline, Sp. Asst. Atty. Gen., and A. H. Elder, of Washington, D. C., for defendants.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. In form this suit in equity is brought against the United States alone, but the Interstate Commerce Commission (which has intervened and answered) is the real defendant. The controversy has been heard in the District Court by the three circuit judges under the provisions of the Act of October 22, 1913 (38 Stat. 220, c. 32).

The questions for decision arise under the Act of August 24, 1912, known as the Panama Canal Act, and especially under section 11, which amends section 5 of the Interstate Commerce Act of 1887. The amendment makes it—

" * * * unlawful for any railroad company or other common carrier subject to the act to regulate commerce to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

through the Panama Canal *or elsewhere* with which said railroad or other carrier aforesaid *does or may compete for traffic*, or any vessel carrying freight or passengers upon said water route or elsewhere with which said railroad or, other carrier aforesaid does or may compete for traffic; and in case of the violation of this provision each day in which such violation continues shall be deemed a separate offense."

But, in order that any railroad or other carrier aimed at by the section might have an opportunity to have the question determined whether its relation to the carrier by water was forbidden, and (in case that question should be determined against it) might have a further opportunity either to divorce itself from the carrier by water, or to take such other steps as might seem advisable, the section was not to go into effect until July 1, 1914. Meanwhile the Interstate Commerce Commission was to have the following powers:

"Jurisdiction is hereby conferred on the Interstate Commerce Commission to determine the questions of fact as to the competition or possibility of competition, after full hearing, on the application of any railroad company or other carrier. Such application may be filed for the purpose of determining whether any existing service is in violation of this section, and pray for an order permitting the continuance of any vessel or vessels already in operation, or for the purpose of asking an order to install new service not in conflict with the provisions of this paragraph. The commission may on its own motion, or the application of any shipper, institute proceedings to inquire into the operation of any vessel in use by any railroad or other carrier which has not applied to the commission and had the question of competition or the possibility of competition determined as herein provided. In all such cases the order of said Commission shall be final."

Still further, Congress was aware that certain situations then existing might fall within the letter of the statute, although they did not offend against the spirit; and the section therefore goes on to enlarge the power of the commission by the following provision:

"If the Interstate Commerce Commission shall be of the opinion that any such existing specified service by water, other than through the Panama Canal, is being operated in the interest of the public and is of advantage to the convenience and commerce of the people, and that such extension will neither exclude, prevent, nor reduce, competition on the route by water under consideration, the Interstate Commerce Commission may, by order, extend the time during which such service by water may continue to be operated beyond July 1, 1914. In every case of such extension, the rates, schedules and practices, of such water carrier shall be filed with the Interstate Commerce Commission and shall be subject to the act to regulate commerce and all amendments thereto in the same manner and to the same extent as is the railroad or other common carrier controlling such water carrier or interested in any manner in its operation: Provided, any application for extension under the terms of this provision filed with the Interstate Commerce Commission prior to July 1, 1914, but for any reason not heard and disposed of before said date, may be considered and granted thereafter."

Upon the passage of this act the Lehigh Valley Railroad Company was obliged to decide what course it should pursue. It is a Pennsylvania corporation and an interstate carrier; it owns or operates a rail line from Jersey City to Buffalo, and connects with other carriers. It is the sole stockholder in the Lehigh Valley Transportation Company, a New Jersey corporation which owns and operates a fleet of freight-carrying steamships on the Great Lakes, that interchange both east-bound and west-bound freight with the railroad company at Buf-

falo. The railroad company has no interest, either by ownership, lease, or otherwise, in any rail line west of Buffalo, but by means of through routes and joint rates it has an interest in the freight that is carried over several lines between the East and Chicago, Milwaukee, and other western points. Its rail line and its water line do not parallel each other. Physically, one merely prolongs the other, but by means of through routes and joint rates some freight carried over one line reaches some of the markets entered by freight carried over the other. At once, the question was presented: Is this a situation forbidden by the act of 1912? The railroad company believed that a negative answer should be given, but of course it desired a decision by some tribunal of authority.

To obtain such a decision, two courses at least were open: First, to continue the operation of both lines, and take the risk of defending successfully when the United States should sue for the penalty imposed by the act to regulate commerce. But, as the penalty is $5,000 a day, the risk was evidently excessive, and in the end the other course was adopted, namely, to apply to the commission for a ruling. Indeed, the commission itself had taken the initiative, for in February, 1913, it had sent out a circular to numerous carriers—to the plaintiff, among the number—asking for information in reference to water lines, and in the following July the plaintiff had furnished the information requested. In December the commission called attention to the fact that it was empowered "to extend the time beyond July 1, 1914, during which a railroad or other common carrier may continue the operation of service by water, if such service is of advantage to the convenience and commerce of the people, and such extension will neither exclude, prevent, nor reduce, competition on the route by water under consideration"; adding, that it would expect every application for such extension to be filed with the commission not later than March 1, 1914. Accordingly, on January 21st, the plaintiff applied for a hearing on the question whether competition, or the possibility of competition, existed between itself and its water line, and prayed the commission to make an order that the railroad company might continue to operate the steamships of the transportation company after July 1, 1914. Under this petition a hearing was had a few months later, and evidence was taken—but what evidence, or how much, we do not know. Similar applications on behalf of other carriers were also heard, and on May 7, 1915, the commission made a report and order upon the general subject of "Lake Line Applications under the Panama Canal Act." The full report will be found in 33 Interst. Com. R. 699, but the parts that bear upon the case of the plaintiff—either specially, or in common with the other carriers—are for convenience repeated here:

"These cases are before this commission upon petitions filed in accordance with the provisions of section 5 of the act to regulate commerce, as amended by the Panama Canal Act of August 24, 1912. The petitioners are rail carriers owning or having an interest in one or more boat lines with boats plying on Lakes Ontario, Erie, Huron, Michigan, and Superior, hereinafter referred to as the Great Lakes. There has been no order consolidating these cases, but they were heard together. Each case has been considered and de-

cided upon its own record, but as all of the cases involve many points in common, they will be disposed of in one report. * * *

"The Lehigh Valley Transportation Company is owned by the Lehigh Valley Railroad Company and is in addition to this railroad's interest in the Mutual Transit Company line. The only port served in common by the rails and the boats of this line is Buffalo, the port of interchange. * * *

"The first controlling question arising under these applications is whether or not, within the meaning of the Panama Canal amendment, there is or may be competition for traffic between the vessels operated and the railroad interested in them.

"This question would be easily answered in the affirmative if the ports of call were served in common by the boats and by the paralleling rails of the owning railroad. The physical situation would itself establish the case. It appears, though, that no such case is made out on the records here presented, since no two ports of call are served in common by the boats and the paralleling rails of the particular owning railroad entity. * * *

"It is urged that this does not establish a case within the meaning of the act, and that the act only applies to cases where there is competition, actual or potential, between the boats and the rails actually operated by the owning entity. This position takes no account of the extremely broad language used, to define the character of interownership which the act was meant to reach:

" 'From and after the 1st day of July, 1914, it shall be unlawful for any railroad company or other common carrier subject to the act to regulate commerce to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated through the Panama Canal or elsewhere with which said railroad or other carrier aforesaid does or may compete for traffic or any vessel carrying freight or passengers upon said water route or elsewhere with which said railroad or other carrier aforesaid does or may compete for traffic; and in case of the violation of this provision each day in which such violation continues shall be deemed a separate offense.'

"The unsoundness of the contention is at once manifest when it is seen how in every case the act could be evaded by a reorganization incorporating the paralleling rails which reach the port of call into a railroad entity distinct from the entity owning the boats, with the real ownership, through stock control, remaining as before. The contention is faulty and is contrary to the spirit as well as the letter of the act. * * *

"The case presented by the applications of the Lehigh Valley Railroad Company and the Delaware, Lackawanna & Western Railroad Company requires a further consideration of the relation these roads bear toward the traffic hauled, or, rather, which might be hauled, by their boat lines. As before noted, the boat lines owned or in which these railroads have an interest, with the exception of the interchange port of Buffalo, serve no points in common with the rails of any part of the owning railroad system.

"Each of these roads, however, is a party to through all-rail routes and joint rates to all the ports served by its boats with respect to west-bound and east-bound traffic. All of the principal carriers in central freight association territory concur in these rates, including the lines west of Buffalo, which form parts of systems controlled by the petitioning trunk line carriers. The concurrences in the Lehigh Valley rates are shown in Lehigh Valley R. R. I. C. C. B. 9000. The concurrences in the Delaware, Lackawanna & Western rates are shown in Delaware, Lackawanna & Western R. R. I. C. C. No. 9400. These carriers in common with all other trunk line roads make through passenger fares from points on their lines to all central freight association points, including ports served by their boats, in connection with all central freight association carriers who concur in C. L. Hunter's Trunk Line Tariff I. C. C. A–75; Joint Passenger Tariff No. 15. They are also members of the Lake Lines Association and are parties to certain fast freight line arrangements. The effect of such alliances on their boat lines indicates that these railroads are parties to arrangements which make them competitors of their boat lines.

"The through all-rail routes and joint rates which these roads maintain with carriers connecting at their lake interchange ports for points beyond,

including the ports served by their boats, are legitimate and necessary arrangements for the convenience and facility of their rail transportation.

"These petitioners, in connection with all central freight association territory rail carriers, as shown by their concurrences, are the joint makers of tariffs publishing joint through rates for the all-rail transportation to and from the ports served by their boats. The only thing to indicate that the entire all-rail haul is not performed by their respective lines is the concurrence of their connections in these rates. Together with their connections they make a through line from the east to the lake ports over which both east-bound and west-bound traffic moves all rail. They originate the west-bound traffic and control its routing. The actual result of these arrangements is the same as if these petitioners owned the rails reaching these ports.

"The all-rail connections of the Lehigh Valley Railroad Company and the Delaware, Lackawanna & Western Railroad Company, which participate in the through route west of Buffalo, are capable of delivering to these roads at Buffalo many times the volume of east-bound tonnage that it would be possible for these roads to originate through the medium of their own boat lines and deliver to their rails at Buffalo. These petitioning roads, therefore, are very solicitous to promote and improve their relations with their western rail connections. Through route arrangements are reciprocal, since the entire movement of traffic is not in the one direction. So the most potent way in which these petitioning roads can encourage a routing of the east-bound traffic from these western rail connections over their rails is to route as much west-bound traffic as possible over the particular connection or connections which are able to furnish the most east-bound traffic. The west-bound traffic which is so routed is necessarily diverted from the boats of these petitioners. This sacrifice of the boat lines is small when compared to the gains made by these petitioning carriers in the interchanging of all-rail traffic. The east-bound all-rail traffic in almost every instance might just as well be turned over at Buffalo to one of the several rivals of the petitioners extending east. The striving or rivalry for this east-bound traffic causes these petitioners to divert west-bound traffic from their boats, and when they do this they are competing with their boats within the meaning of the act as amended.

"That the existence of paralleling through all-rail routes to which joint through rates are applicable, in which the petitioning railroad participates, is a circumstance bringing any application under this amendment within its provisions, seems clear when the amendment is considered in its application to the railroad ownership of, or interest in, boats operating through the Panama Canal. Neither at the time the amendment became a law, nor now, is there any transcontinental rail line owned or operated by a single railroad or system of railroads in the United States. If therefore the participation of a petitioning railroad in such through route arrangement does not constitute an arrangement by which it is possible for it to compete with its boats operating through the Panama Canal from and to common points, then this amendment, as applied to traffic through the Panama Canal, is of no effect.

"The 'fast freight line' was the forerunner of the through route and had its origin in the lack of arrangements for the interchange of equipment. These fast freight lines acquired large numbers of freight cars and made arrangements with certain roads over which it was desired to establish a through service. This through service could be established by using several different combinations of roads, so there was the same rivalry and striving between these several roads to be members of the particular fast freight line as exists under through route arrangements. The through route established, their business then is to solicit through shipments of freight to move all rail over the 'line' that has been organized. To this end soliciting offices were established in many trade centers. The participation in these 'fast freight lines' entails the same sacrifice on the part of these petitioners' boat lines as was pointed out with respect to the through route arrangements. These roads are members of 'fast freight lines' which are still in existence, and in the nature of things the best interests of their boat lines are made subservient to the interests of their rails, which, of course, are of much greater importance.

"The Lehigh Valley Railroad Company is a party to and has a proprietary interest in the Traders' Dispatch and the Lehigh Valley Wabash Dispatch, fast freight lines reaching Chicago and Milwaukee, ports served by boats of the Lehigh Valley Transportation Company. This petitioner in the year 1913 contributed $69,208.27, to cover its share toward the maintenance of the Traders' Dispatch. * * *

"The Lehigh Valley Railroad Company insists that, if its participation in these fast freight lines and contributions to them is wrong and contrary to the law, it is ready and willing to make any changes that might be suggested by the commission. While such a position is commendable, these cases are to be tried on facts, not promises for future performances, and, under the amendment, the commission is empowered only to pass on the facts of past and present conditions as presented. * * *

"The Lake Lines Association is an 'understanding organization' which, while claiming not to be an organized agency, has held meetings, the records of which, as shown in the evidence presented in these cases, indicate that its function is to insure a 'proper' management of these lines, from the viewpoint of the railroads, which could not have been possible if their operation were unrestrained. The whole arrangement might be classed as a 'get-together movement' to which all the roads here petitioning are parties. While these two petitioning roads which are here specifically under consideration may not directly compete with their boat lines over the rails of their systems, their membership and activity in this association or participation in any like understanding places them in a position inimical to the best interest of their boat lines. Placed in such an attitude, these roads, through the agency of other roads with which they are 'partners,' become the competitors of their own boat lines.

"The lake lines in which the petitioners are interested have been shorn of the initial rate-making power. This power has been usurped by the trunk line association of which the petitioners are members. The through rates controlled by this authority, in which the boat lines are merely concurring carriers, determine for the shipper which lake line must be used. The particular route is controlled by applying arbitrary switching charges at Buffalo, which compel the through lake-and-rail traffic to move via the predetermined lake line. The zones of territory to be served and those not to be served by the lake lines are also determined by this outside authority. This is accomplished by maintaining a scale of rates not subject to competition, that forces traffic by either all-rail or lake-and-rail routes, as desired by the trunk line association. The interests and concern of the trunk line association in fixing these different combinations of rates is simply the solidified interest of the several member railroads, whose individual interests have been above indicated.

"What has been said with special reference to the petitioners Lehigh Valley Railroad Company and the Delaware, Lackawanna and Western Railroad Company applies with equal force to each of the other petitioners herein, since each is a party to through all-rail routes reaching the several ports served by their boats, as well as a member of the Lake Line Association.

"From a consideration of all the circumstances, the commission is of opinion, and finds, that each of the applicants here involved does or may compete for traffic with the lake line or lines in which it has an interest.

"In the present cases, however, which are not applications for the extension of a service operating through the Panama Canal, the finding that competition, actual or potential, exists does not ipso facto require the separation of the petitioning railroads from the boat lines in which they are interested within the meaning of the act.

"In extending to all water commerce the legislative idea above referred to, of unrestricted competition between rail lines and water routes, a proviso was prescribed where such water commerce was not routed through the Panama Canal, as follows:

"'If the Interstate Commerce Commission shall be of the opinion that any such existing specified service by water other than through the Panama Canal is being operated in the interest of the public and is of advantage to the convenience and commerce of the people, and that such extension will neither

exclude, prevent, nor reduce competition on the route by water under consideration, the Interstate Commerce Commission may, by order, extend the time during which such service by water may continue to be operated beyond July 1, 1914.'

"Each of the applicants strongly urges that the boat line or lines in which it is interested is being operated within this proviso of the act, and quite an array of conditions now prevailing are advanced in support of this contention.

"It is urged that the experience has been that the boat lines have been a losing proposition as a distinct operating unit, but that by reason of the financial strength of the owning railroad the boats have been kept in service, the operating at a loss, and that this condition could not or would not prevail if it were not for the joint ownership; that the boats would otherwise disappear from the lakes; and that thus keeping these boats in the service is 'in the interest of the public and is of advantage to the convenience and commerce of the people.'

"Whether the poor financial statements presented by certain of the lake lines are due to inherent natural difficulties or the course of operation induced by the joint control is a question of considerable doubt on the records presented here. By reason of the particular accounting plan that has been followed, a material deficit is shown; whereas, according to the apparently more accurate system employed by the commission's examiners of accounts, the same line, viz., the Mutual Transit Company, shows profitable operation. The explanation of the system employed made by the auditor of this line was that it was devised to avoid taxation of the profits that would otherwise have been shown. It also appeared as the opinion of an official of one of the lines that the condition was due to the fact that the differential between the lake-and-rail rate and the all-rail rate was too small to encourage a remunerative amount of traffic to move, and he intimated that, if the joint control did not exist, the boat lines would lower their rates to a point where their bottoms would be filled.

"It is urged, however, that, though such independent operation might be more remunerative, it would necessarily become irregular and irresponsible, and that joint ownership has furnished the shipping public with a regular and uninterrupted service, which is admittedly of advantage to the convenience and commerce of the people. To render this regular service, it is said, the boats must move whether under light or full cargo, and experience indicates that the cargoes are light most of the time, entailing expensive operation, a policy of operation that can only be maintained under joint ownership.

"The joint ownership and operation guarantees to the public the responsibility of the lake service, it is contended, to the same degree that the responsibility of the service of the owning railroad is assured.

"It is urged that, under the joint ownership and operation, a duplication of records and much work is obviated and many terminal expenses are reduced, all of which tend to more economical transportation and a lower cost for the lake haul, in the interest of the public and of advantage to the convenience and commerce of the people.

"In further support of the contention, it is urged that the increased powers of this commission under the act as it is now amended confer full jurisdiction to regulate and control the lake line situation, so that the railroads cannot in the future so use the boat lines they own as to stifle competition on the great lakes. It is pointed out that this commission may require the establishment of physical connections between the dock of the water carrier and the rails of any rail carrier or carriers subject to the act and prescribe the terms and conditions under which such construction is to be performed; that through routes and maximum joint rates may be established between and over rail and water lines, and the commission may determine the terms and conditions under which they shall be operated; that maximum rail proportional rates may be established, and the traffic to which and the vessels to which same apply may be determined; that, where there is an extension of the joint service as now operated, the rates, schedules, and practices of the water carriers will have to be filed with the commission and be subject to the same supervision as that exercised over the railroads in this respect.

234 F.—44

"In passing on the question of whether or not the particular boat line is being operated within the proviso of the act, it is necessary to first determine the purpose of the legislation which gave rise to these petitions. From an examination of the congressional debate from which the act emerged, it is at once clear that the spirit which undoubtedly prompted this legislation was a desire to preserve to the common interest of the people, free and unfettered, the 'water roadbed' via the Panama Canal, which was nearing completion. Coupled as it is, the legislative purpose of the other parts of the amendment with respect to waters 'elsewhere' must necessarily have been to restore all the water routes of the country to the same condition of freedom from any domination that would reduce their usefulness.

"For any case to be within the spirit of this proviso it is necessary to show a situation in which are present all the elements which pevail, or would prevail, were the water service independently operated. On a water course where the boats and boat lines are free from domination or control by the railroads, and where they are left to survive as their merit or their ingenuity of their owners makes possible, there will be, and always is, a healthy rivalry and striving between such boat lines themselves and with paralleling railroads for all suitable and available traffic. There is competition. This rivalry manifests itself in several ways. The rates charged fluctuate according to economic principles, and the shipper enjoys invariably, as a result, lower charges for the transportation routed over such waterways and thereby reaps a return from the 'nation's highway.' Necessarily, coincident with the lowering of the rate, there is a rivalry in service which is an equally strong weapon of competition. The condition is one which results in the beneficial use of the waterways accruing to the shippers. As far as this legislation concerns water routes elsewhere than through the Panama Canal, the spirit and purpose of it is to restore to the people the beneficial use of the natural common highways.

"The right to use the waterways of the country as a means of transportation is a natural right, but this right may not be abused to the injury of others, and it is the public right that the waters be so used as to return benefit to the people.

"The waterways of the country furnish ready-made roadbeds for transportation routes, on which the rates for shipment may be made low because of this physical fact. But these arteries of commerce, without boats to ply on them, are useless for transportation purposes. And although there may be many boats plying on these water routes, they may be so operated as to produce practically the same condition of things as would exist were there no boats afloat.

"As a natural and usual course of experience, where a railroad acquires and undertakes to operate a competing boat line, the rate for the water transportation ceases to be influenced solely by those ordinary conditions which affect such traffic, because a new element is introduced into the situation, namely, the interest of the owning railroad.

"This discussion of general principles points the basis for the legislation here under consideration. If such is the basis, what is the purpose of the legislation, if it is not to relieve the water courses of the country from the domination of the rail carriers?

"Congress has decreed that there shall be a restoration of conditions which prevailed when railroads had no interest in and exercised no control over the boat lines plying the country's water routes. That the legislation might not be arbitrary, but be effective within constitutional limitations, certain provisions were made so that in given instances, which form exceptions to the usual experiences in cases of joint ownership, such ownership may be continued. To comply with this legislative direction, however, it is necessary to divorce the railroads from their boat lines, unless the particular case comes within the exception as provided. If this is not the result, of what avail is this legislation?

"The inquiry in these cases is, therefore: Is the joint operation of these boat lines such as to make of them an exception? Or, in the words of the statute, is the service by water being operated in the interest of the public, and is it of advantage to the convenience and commerce of the people, and

will an extension and a continuance thereof exclude, prevent, or reduce competition on the route by water under consideration?

"The contentions of petitioners as to responsibility and regularity of this service under joint operation lose weight when it appears that there has been no lowering of the cost of water transportation accompanying them. It appears from correspondence passing between a boat line manager and an official of the owning railroad, which forms a part of these records, that this manager attributes the small tonnage hauled by his line, and the consequent small revenues, to the fact that the differential between the lake-and-rail rates and the all-rail rates is too small. He urged a larger differential, assuring his superior that such a policy would enable him to profitably operate the boat line.

"Instead of lower rates in prospect, it is made to appear that it is only the greater financial strength of the owning railroads that enables the present boats to operate. as it is contended that certain boat lines are being operated at a loss. If this be true, then there is no prospect for lower rates under continued joint ownership, and the public is reaping little benefit from this waterway, and the situation is almost the same and will be the same as if no waterway existed.

"No doubt, under joint operation, certain economies can be effected; but these economies have not manifested themselves in a reduced lake-and-rail transportation cost to the public. Instead of any reduction in lake-and-rail rates, they have been steadily advanced under joint ownership. Beginning about 1900, when trunk line control over the lake lines was becoming perfected, the first-class lake-and-rail rate from New York to Chicago has been advanced by successive increases from 54 cents to 62 cents; the rates on the other classes have been correspondingly advanced. In 1910, according to statements in the records which were not controverted, the trunk line interests agreed that the lake-and-rail rates should actually be advanced to the all-rail basis, thus wipe out the differential except on first class, which was to be advanced from 62 to 70 cents. This action was only thwarted by the refusal of a foreign railroad owning a lake line to acquiesce therein. These successive advances, as the records show, have had the effect, not only of preventing an increase in lake line tonnage, but in diverting from the lake routes to the all-rail lines, part of the tonnage which formerly moved on the lakes. Furthermore, there is much in the records tending to show that the very purpose of these advances in lake-and-rail rates was to divert tonnage to the all-rail lines. As a direct result of this rate policy of the owning railroads, the lake boats have operated with small cargoes, although their operating expense was almost as great as if they had been fully loaded. This has in turn resulted in a high operating cost to the lake lines per unit of freight. Does not this policy fully explain the lake line deficit? Again, do not such facts make clear that whatever economies might be realized by joint ownership are offset by the waste resulting from the unfair use of vessel tonnage in the interests of the owning railroads? The railroad control of these boat lines cannot be said to be in the public interest when the policy of these railroads has been, by an artificial rate structure, to deprive the public of the natural benefits that would flow from a free use of this waterway.

"In deciding these cases, the commission is required to judge as to whether or not these boat lines are being operated in the public interest under joint ownership, and then it must say whether the continuance of this operation will result in reducing, preventing, or excluding competition on the route by water.

"That the joint ownership and operation of these boat lines has resulted in no real benefit to the people, and that the operation is not in the interest of the public or of advantage to the convenience and commerce of the people, is established by the facts as above indicated, and a complete monopoly is exercised by the owning railroads over the lake line situation through the medium of the Lake Line Association.

"The arguments that the increased powers of the commission have remedied the situation are faulty, since it does not appear that this commission has any special jurisdiction under this amendment to stop the operation of this Lake Line Association or to prevent the establishment of some other like

arrangement later on. These arguments also lose weight in view of the fact that the increased jurisdiction of the commission will be just as available in the control of the lake line situation hereafter under independent operation of the lake lines, as under a continued joint operation. The public will enjoy all the benefits contained in the amendment through the enlargement of the commission's jurisdiction with respect to water transportation, and at the same time, and in addition, there will accrue such benefits as will result when water rates and service are influenced by competition.

"After divorcement this commission may still regulate just as fully as under joint control, and through rail-and-water rate, fixing a reasonable maximum. It may also fix the maximum rail proportional of such through rate. It may still require the physical connection between the dock of a water line and the rails of any and all carriers serving a port of interchange.

"The records here show no instance where the boat lines owned by the different rail carriers have actively competed for traffic with one another or with the paralleling railroads under the régime of joint ownership and operation. Under independent operation each of the lines which is now owned and operated by a railroad, in order to survive, will become a competitor of every other boat line and of every paralleling railroad for all traffic which moves by the great lakes or which might move over that route, and the result of such operation will be reflected in the character of service furnished the public and in the rate charged therefor.

"The boat lines operating on the Great Lakes in conjunction with the barge lines operating on the Erie Canal furnish a through water route from the western lake ports to the eastern seaboard. It is significant from the records in these cases that the through route arrangements and the interchange of traffic between lake lines and these canal barge lines have been terminated under the joint ownership of the lake lines, and the traffic has practically disappeared, to the injury of the boat lines and of the Erie Canal barge lines on east-bound traffic. It is contrary to the interests of the owning railroads operating from Buffalo east, for their boat lines to continue any through operating arrangement with these canal barge lines for the movement of east-bound traffic. There is no power in this commission to require the establishment of a through route between these railroad-owned lake lines and barge lines operating the Erie Canal, but under divorcement the lake lines will be free to make arrangements for the through carriage of freight in connection with the Erie Canal barge lines, and it will be to their interest to do so. The interests of the shipping public will be conserved, and those of the boat lines will be bettered in this respect under divorcement.

"These boat lines under the control of the petitioning railroads have been first a sword and then a shield. When these roads succeeded in gaining control of the boat lines which had been in competition with paralleling rails in which they were interested, and later effected their combination through the lake line association, by which they were able to and did drive all independent boats from the through lake-and-rail transportation, they thereby destroyed the possibility of competition with their railroads other than such competition as they were of a mind to permit. Having disposed of real competition via the lakes, these boats are now held as a shield against possible competition of new independents. Since it appears from the records that the railroads are able to operate their boat lines at a loss where there is now no competition from independent lines, it is manifest that they could and would operate at a further loss in a rate war against independents. The large financial resources of the owning railroads make it impossible for an independent to engage in a rate war with a boat line so financed.

"From a consideration of all the circumstances and conditions disclosed by the respective records herein, the commission is of the opinion and finds that none of the several existing specified services by water herein concerned is being operated in the interest of the public or is of advantage to the convenience or commerce of the people within the meaning of the act, and that an extension and a continuance thereof will prevent, exclude, and reduce competition on the great lakes. The application of each of the petitioners herein is therefore denied, effective December 1, 1915. An order will be entered accordingly."

The order of May 7th made the report of the commission a part thereof, and denied the plaintiff's application, but postponed the effectiveness of the order until December 1, 1915 (afterwards extended to December 15th). The railroad company was dissatisfied with the result, and on September 17th applied for a rehearing. This was granted, and in October the rehearing was had. On December 13th the commission made another report (37 Interst. Com. R. 77), which follows in extenso:

"The Lehigh Valley Railroad Company, as owner of the entire capital stock of the Lehigh Valley Transportation Company, which operates six vessels on the Great Lakes, filed a petition for rehearing on September 18, 1915, requesting the commission to reopen and reconsider the petitioner's application for permission to continue its lake line service after July 1, 1914. The commission, in lake line applications under Panama Canal Act, 33 I. C. C. 700, had previously denied the original petition of this carrier under section 5 as amended; such denial to be effective December 15, 1915. The subject-matter of the present petition was set for argument on October 23, 1915, solely upon the question whether the commission's order of May 7, 1915, in so far as it affected the Lehigh Valley Railroad Company, should be modified.

"Subsequent to the filing of the petition by the railroad company, petitions for permission to intervene were filed by the Milwaukee Chamber of Commerce and the Chicago Board of Trade. These parties were permitted to intervene.

"While the petition requested a rehearing, it was conceded by counsel for the railroad company at the argument that no reason had been suggested why the case should be reheard. The only issue raised was whether or not the commission had erred in assuming jurisdiction to deny the application of the Lehigh Valley Railroad for permission to continue its lake service. In other words, the only question now before the commission is whether or not the Lehigh Valley Railroad Company does, or may, compete with its lake line so as to bring it within the provision of section 5 as amended. The petition of the railroad company was based upon two grounds: (1) That the commission's finding of fact that competition does or may exist between the railroad company and its lake line was erroneous; and (2) that the commission's interpretation of the word 'competition,' as used in section 5 as amended, was, as a matter of law, unsound. It will be observed that these propositions, if true, would establish that the commission had no jurisdiction over the Lehigh Valley Railroad lake service under section 5 as amended.

"In support of the petitioner's first contention, it was urged that the commission erred in finding that this carrier's participation in joint rates and through routes with railroad companies which parallel the Lehigh Valley Transportation Company tended to show competition between this carrier and its lake line, since joint rates and through routes may be prescribed by the commission, and it is contrary to reason to assume that a relationship which the commission itself could establish is sufficient to give the commission jurisdiction to order a divorcement. It was further urged that the commission erred in finding that the participation of the railroad company in fast freight lines which compete with the lake service tended to show competition, since these fast freight lines are said to be mere trade-names employed for advertising purposes, and in fact imply no more than the existence of joint rates and through routes.

"It will be manifest form a reading of the commission's original opinion that the two considerations just noted were not deemed by the commission in themselves to be conclusive evidence of competition. The participation of the railroad company in fast freight lines, joint rates, and through routes, which run parallel to through routes in which the lake line participates, were deemed significant as showing that in addition to the purely local traffic of the railroad and the lake line, as to which there could be no competition, these companies were largely interested in through traffic as to which there might be competition. The above circumstances, together with the large vol-

ume of evidence showing aggressive activities of the Trunk Line Association and the Lake Lines Association, in which the Lehigh Valley Railroad Company was a party, in developing and extending the traffic over the all-rail through routes at the expense of the lake-and-rail routes, including that in which the lake line participated, demonstrated that the possibility of competition for through traffic between the railroad company and its rail connections and the lake line was real and substantial—so real and substantial that the railroad company acting with other trunk lines organized and maintained the Lake Lines Association, a chief function of which was the controlling of lake rates and service in such a manner as to advance the interest of the all-rail routes.

"The second contention of the petitioner was that in spite of all the facts of record the commission could not, as a matter of law, find that competition did or might exist between the petitioner and its lake line, because competition as a matter of law could not exist between two carriers unless one was 'striving' for traffic which the other one was actively seeking and wished to secure, and that such a relationship could not exist between the petitioner, and its lake line, since the latter was merely an extension of the former. The record discloses that the lake line has an annual deficit of about $100,-000 which must be borne by the petitioner. Why the railroad company should be anxious to continue its interest in the lake line in spite of this annual deficit is a question that immediately suggests itself. One of the officials of the railroad, who should be familiar with all of its traffic and rate interest, testified that he could not tell whether the lake line was a benefit or a burden to the railroad from a dollars and cents standpoint, but that one reason which he was certain led the railroad to maintain its interest in this lake line was to secure for the railroad a voice in the making of the all-rail rates from Chicago to the East.

"This leads to the inquiry: What interest has the Lehigh Valley Railroad in the all-rail rates from Chicago to the East? Its chief interest obviously is in the amount of the division of the all-rail rate which it is able to exact from its rail connections. If the Lehigh Valley was wholly dependent on its rail connections, they would be in a position to dictate the division it would receive. While the Lehigh Valley has a lake line, however, it has a voice in what the all-rail rate should be, and, what is more important, it is in a position to demand large divisions of these rates. The record shows, as might be expected under such conditions, that on most of the east-bound traffic the Lehigh Valley Railroad divisions of the all-rail rate from Chicago to the East are larger than its division of the lake-and-rail rate for the same haul. Thus it has come about that the railroad gets more revenue out of the all-rail haul than out of the lake-and-rail haul on a particular shipment. Here, then, is a situation where the interest of the Lehigh Valley Railroad directly conflicts with the interest of the lake line. To the extent that the Lehigh Valley Railroad is induced by its division of the all-rail rates to divert traffic from the lake-and-rail to the all-rail route, it is 'striving' against the lake line which it owns.

"That this conflict of interest between the railroad and the lake line as to through traffic is not academic, but, on the contrary, exerts a real influence on the traffic policy of the railroad, is made clear by the record. A letter from one official of the railroad company to another in 1904 is in the record, wherein it was stated that in connection with the east-bound movement of flour from Chicago 'the old question' was presented 'whether it is better to allow this business to go via central traffic roads and go after them for a share of it or make arrangements at Buffalo which would bolster up our lake line and concentrate freight there for shipment to the East.' The official who wrote this letter testified that the situation from the standpoint of freight solicitation was the same to-day as in 1904. Thus it appears that the solicitation of east-bound traffic by the railroad is not done with an eye single to the interests of the lake line in the haul from Chicago to Buffalo, but is influenced by the interests of the central freight association road which, with the aid of the Lehigh Valley Railroad, directly compete with the lake line.

"The above considerations make clear that as to a large volume of through traffic east-bound the petitioner does or may 'strive' in the interest of the

all-rail routes for traffic which the lake line might otherwise secure. The facts referred to in the original report of the commission tend to show a 'striving' in another way by the railroad company in the interest of the all-rail route for west-bound traffic from New York to Chicago which might otherwise move by the rail-and-lake route. The record discloses many other facts which, together with those referred to above, show 'competition' within the definition of that word which was given by the Supreme Court in the Union Pacific Case, 226 U. S. at page 87 [33 Sup. Ct. 53, 57 L. Ed. 124].

"The interveners at the argument did not address themselves to the issue raised by the petition of the railroad company. These interveners confined their remarks to a statement as to the hardship that might be imposed upon certain shippers if the lake line were divorced from the railroad company. Their statement reflected the uncertainty that attends a change effected by legislation. The views urged by the interveners have no bearing upon the question as to the proper interpretation and application of the act to the facts at hand.

"After reviewing its previous findings and order in the light of the present proceeding, no reason appears why the commission should modify its order denying the application of the petitioner as to its lake line service. An order will be entered dismissing the petition for rehearing."

Accordingly, an order was filed on December 13th, making the report just quoted a part thereof and dismissing the petition for a rehearing. Being still dissatisfied, the railroad company (having tried and failed in the previous September to induce the Department of Justice to agree to a test case in the courts) renewed the effort, ran one of its boats on December 16th from Chicago to Buffalo, and again asked the department to bring suit for the penalty so that the question might be decided by the federal tribunals. After some correspondence, this effort also came to nothing, and the result was that the bill now before us was filed.

After a full recital of the foregoing facts, the bill prays for service on the respondent (the United States), on the Attorney General, and on the Interstate Commerce Commission, and asks that the United States and the commission "be perpetually enjoined and restrained by a decree and injunction of this court from enforcing the said order of the Interstate Commerce Commission of May 7, 1915, and from taking any steps or instituting any proceedings for the enforcement thereof." A preliminary injunction "to the same purpose, tenor, and effect" was also asked for, and was granted as a matter of form, in order to preserve the status quo. Shortly afterwards, a final hearing was had, but no evidence was offered except the two reports of the commission.

Upon the foregoing facts, we are of opinion that for either of two reasons the injunction prayed for should not be granted.

[1] 1. We have serious doubt whether injunction is an appropriate remedy in the present situation. We think it important to observe precisely what Congress has done. Essentially, the act ordains that after July 1, 1914, common interest of a certain kind between two classes of carriers shall be unlawful, but it does not declare how such common interest shall come to an end. The only express sanction to be found in the act is a penalty for each day's violation of the statutory command. A method of procedure is provided by which the commission may determine whether a carrier does or does not fall within the class of offenders: if it does not so fall, of course the act

does not forbid the relation; but, even if it does so fall, the commission still has the power to suspend the operation of the act, if certain specified conditions are found to exist. If the conditions do not exist, the offending carrier is left exposed to the statutory penalties; the commission is not directed and apparently has no power (unless the power be implied) to take affirmative action toward dissolution. The plaintiff seems to suppose that the commission has authority to order an offending carrier to divorce itself from the carrier by water; and, indeed, it seems to suppose also that the order of May 9, 1915, is at least the equivalent of such a command. We do not so understand the situation. Whatever advice on this subject the commission may have seen proper to give, either expressly or by implication, what the commission has actually done is merely to refuse to act; it has declined to suspend the operation of the statute in the plaintiff's favor. No order of divorcement or any other affirmative command has been issued. The order complained of is purely negative, and nothing else is before us.

We are not considering the power of the United States to interfere directly by asking a court of equity to decree that the relation between two carriers should be dissolved. We confine the discussion to the questions that we understand to be presented—the power, and the action, of the commission. If a federal court had authority to issue a mandamus to the commission directing it to suspend the operation of the act in a case that might seem sufficient to the court, such a proceeding might furnish a remedy under which the plaintiff could raise the questions it desires us to consider. But Congress has added no such power to the limited jurisdiction of the federal courts, and we think none can be exercised. Section 11 of the Canal Act must be left just where Congress chose to leave it, namely, with a declaration of what conduct is to be unlawful after a specified date, and with the sanction of a penalty large enough to make the declaration effective. In substance, Congress has said to an offending carrier:

"Here is a rule of conduct for your guidance. If you choose to continue a relation that has thus been declared unlawful, although the commission does not take any direct action to dissolve the connection, we shall make that connection so expensive to maintain that you will be glad to dissolve it of your own motion."

And as the commission has kept strictly within the power conferred by Congress, and is not threatening to overstep the mark, we are much in doubt whether any ground exists upon which the injunction asked for can be based.

[2] 2. But, if we should be mistaken in this view, and if an injunction should issue in a proper case, we are further of the opinion that no such case has been made out by the record before us. No evidence was offered except the two reports quoted above, and as section 11 makes the order of the commission final, and as that order embraces the finding that the plaintiff "does or may compete for traffic with the lake line or lines in which it has an interest," this would seem to be an end of the controversy. The plaintiff, however, attacks the "jurisdiction" of the commission to make such a finding or order, and

(as we understand the argument) supports the position by contending that no competition is possible under the physical conditions that confessedly prevail, and therefore that the order is arbitrary and completely disregards the evidence.   But this is not an attack on the commission's "jurisdiction"; its right to judge depends on the statute, and the statute in terms gives it the right to inquire and determine whether a given situation presents a case of actual or potential competition.   This is precisely what the plaintiff asked, and what the commission undertook, namely, an inquiry whether the railroad competed actually or potentially with its own fleet of boats; and we entertain no doubt that the jurisdiction existed, and that it was directed to a proper object.   In what manner the commission may have exercised this right is, of course, a different question.   Its findings are made final, and final they must remain, but with one qualification— certain fundamental rules must have been obeyed.   In spite of the statutory declaration of finality, the courts still retain a limited power of supervision—enough to see that constitutional requirements have been observed.   Intermountain Rate Cases, 234 U. S. 490, 34 Sup. Ct. 986, 58 L. Ed. 1408; U. S. v. R. R., 235 U. S. 320, 35 Sup. Ct. 113, 59 L. Ed. 245.   There must have been a "hearing," with the essentials involved in that word, and the action of the commission must not have been arbitrary; but in other respects we have no right to review what has been done, or the manner of doing it.   We cannot substitute our judgment for the judgment of the commission on the weight or the effect of the evidence, or correct mistakes that may have entered into the findings of fact.

Now the finding, that the plaintiff does or may compete for traffic with its boat line, is the finding of an ultimate fact, exactly as the finding of discrimination was decided to be in Meeker v. Railroad Co., 236 U. S. 427, 35 Sup. Ct. 328, 59 L. Ed. 644; and the only question that remains is whether such a finding was made without evidence, or by disregarding the evidence plainly and arbitrarily.   In view of the full reports of the commission, the subject need not be discussed.   It is clear to us that the commission had before it other relevant evidence than the fact that the plaintiff's boat line did not parallel its rail line, but that physically one was merely a prolongation of the other. The real question was: What effect the traffic over one line had, or might have, upon the traffic over the other?   Or, in other words, was the amount of money received from freight carried by one line affected, or likely to be affected, by the amount of money received from a similar source by the other line?   Upon this point there was relevant evidence before the commission, and its finding is conclusive.

[3] 3. In conclusion, a few words may be said concerning the constitutionality of section 11.   The plaintiff's argument does not attack the power of Congress to enact that competing carriers must be free from control by a common interest, and concedes the power to authorize the commission to decide whether competition exists, either actual or potential.   The contention is that Congress has gone too far in the third paragraph of section 11, which empowers the commission to permit the operation of an "existing specified service by water"

beyond July 1, 1914. The paragraph is perhaps somewhat lacking in clearness and precision:

"If the Interstate Commerce Commission shall be of the opinion that any such existing specified service by water other than through the Panama Canal is being operated in the interest of the public and is of advantage to the convenience and commerce of the people, and that such extension will neither exclude, prevent, nor reduce competition on the route by water under consideration, the Interstate Commerce Commission may, by order, extend the time during which such service by water may continue to be operated beyond July first, nineteen hundred and fourteen."

But, taken in connection with the earlier paragraphs, we think the fair construction is that, even if the commission shall find that competition, or the possibility of competition, now exists between a particular carrier by land and a carrier by water under common control, the service by water may still be continued if the commission shall be of opinion that the convenience and commerce of the people will be promoted thereby, and "that such extension will neither exclude, prevent, nor reduce, competition on the route by water under consideration."

In other words, having found that the two carriers actually compete, or may compete, the commission may nevertheless permit the common control to continue and may allow the land carrier to continue the service by water, if the public interest will be promoted thereby, and if continuance of the common control does not injure the existing, or the potential, competition. The plaintiff objects to these provisions on the ground that Congress should have enacted a standard to which the commission should conform in determining these questions, and contends that no such standard has been ordained, and that the whole subject has been turned over to the arbitrary action of the commission. We do not agree with the argument. In our opinion Congress has done all that was reasonably necessary. In the earlier paragraphs of the section, a standard is set up—actual or potential competition—but of necessity Congress was obliged to leave the commission to decide whether the varying facts of varying situations did or did not conform thereto. The statute declares what rule of decision shall be applied to every case; but, as the precise facts of every situation could not possibly be known, the commission was of necessity empowered to ascertain them. As already stated, this part of the section is not attacked, and in view of several well-known decisions of the Supreme Court it could not be successfully attacked, as unconstitutional. It is no more a delegation of legislative power than is the delegation of power to decide whether a rate is "reasonable" or a practice is "discriminating."

And for similar reasons we think the objections to the paragraph now in question must also fail. No legislative body can deal in detail with all the complex relations of modern commerce. In most instances, all that can be done is to state principles and lay down general rules, intrusting the proper tribunals with the task of applying them. Congress evidently saw that in exceptional situations the convenience and the commerce of the people might profit from an existing service by water, although a carrier by land might be controlling its operation. This is the first inquiry, and it presents a question of fact. And

the second inquiry is also of fact: If the common control and operation be continued, will competition over the route by water be excluded, prevented, or reduced? The facts once ascertained, the rule laid down by Congress is to be applied, namely, unless the public interest will be served, and unless competition will be maintained, common control is forbidden; but, if the public interest will be promoted, and if competition will not suffer, common control may continue In our opinion these provisions were indispensable, and indeed unavoidable.

The lawmaking power laid down as definite a rule as it could, and merely intrusted the commission with authority to ascertain the facts. The commission did not ordain the rule, but merely applies it. Indeed, the plaintiff seems to overlook this aspect of the statute. In sweeping terms, *all* forms of joint control are forbidden to the carriers described, but the paragraph now attacked allows the commission to suspend the prohibition in a certain class of cases. This is a favor granted to the carriers in exceptional cases, and is not the invasion of a right. If they had a right to be invaded, it was the right of common control; but this (it is conceded) was lawfully taken away, and the carrier can hardly criticize the terms on which the sovereign sees fit to restore it as a matter of grace.

A decree may be entered dismissing the bill.